UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**Case No. 12-21894-CIV-COHN**

**MARBEL MENDOZA,**

      Petitioner,

vs.

**MICHAEL D. CREWS,**[1] Secretary,
Florida Department of Corrections,

      Respondent.
_____\

**ORDER ON PETITION FOR WRIT OF HABEAS CORPUS**

    **THIS MATTER** is before the Court upon Petitioner, Marbel Mendoza's ("Mr.

Mendoza") Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254. (DE 1).  Mr.

Mendoza is on Florida's death row at the Union Correctional Institution in Raiford, Florida

following his conviction for the first-degree felony murder of Conrado Calderon in 1992.  Mr.

Mendoza filed this petition on May 18, 2012. (DE 1).  On October 18, 2012, the State filed its

Response. (DE 17).  On December 21, 2012, Mr. Mendoza filed his Reply. (DE 22).  The Court

has carefully reviewed Mr. Mendoza's petition, the entire court file and is otherwise fully advised

in the premises.  For the reasons that follow, the Petition for Writ of Habeas Corpus is **DENIED.**

_____

    [1] During the course of these proceedings, Kenneth S. Tucker was replaced as the
Secretary of the Department of Corrections by Michael D. Crews who is now the proper
respondent in this proceeding.  Crews should, therefore, "automatically" be substituted as a party
under Federal Rule of Civil Procedure 25(d)(1). The Clerk is directed to docket and change the
designation of the Respondent.

## *I. FACTUAL BACKGROUND*

The Supreme Court of Florida gave the following summary of the pertinent and salient

facts:

> Appellant asked Humberto Cuellar to participate in robbing Conrado Calderon, who owned a mini-market. Humberto asked his brother, Lazaro Cuellar, to act as the getaway driver. The three men observed Calderon's morning routine at his house in Hialeah. Then, before dawn on the morning of March 17, 1992, the three drove to Calderon's house where they stopped and waited. When Calderon appeared at his front door at 5:40 a.m., Humberto and appellant hid behind a hedge. Appellant carried a .38 caliber revolver, and Humberto carried a 9 mm automatic pistol. As Calderon left his house and approached his Ford Bronco, Humberto and appellant approached Calderon from the rear and held him in Calderon's driveway between his Ford and Cadillac automobiles. During the ensuing struggle, Humberto used his gun to hit Calderon on the head. Calderon took out a .38 special revolver and shot Humberto in the chest. The injured Humberto ran to Lazaro's car. As he ran, Humberto heard other shots. Less than a minute later, appellant arrived at Lazaro's car and told Humberto that appellant had shot Calderon. No money was taken. The three drove to a hospital in Hialeah. On the way, appellant told Humberto to say that Humberto had been shot by someone who had robbed him.
>
> At the hospital, police recovered Lazaro's car containing Humberto's 9 mm automatic pistol. The pistol was still fully loaded and had hair embedded in the slide, which was consistent with the gun having been used to hit someone on the head. The same day, Humberto was taken to the Hialeah Police Station, where he gave a sworn statement that matched his later testimony for the State. When appellant was arrested on March 24, 1992, he had shaved his head and moved out of his normal residence. Items recovered from the scene included a bank bag, which was under the victim and contained $2,089, and other cash which was in Calderon's pockets and wallet. Appellant's fingerprints were found on Calderon's Cadillac, adjacent to where Calderon's body was found. Calderon's gun was found under his body. Casings and bullets were recovered from the scene and from the victim's body. An x-ray of Humberto showed that the bullet lodged near his spine was consistent with Calderon's .38 special. Three of the four .38 caliber shots that hit Calderon were fired from point-blank range, and the last was fired from less than six inches away.
>
> Lazaro Cuellar pled guilty to manslaughter, conspiracy, and attempted armed robbery and was sentenced to ten years in state prison. He did not testify at appellant's trial. Humberto Cuellar pled guilty to second-degree murder,

conspiracy, attempted armed robbery, burglary, and use of a firearm in the commission of a felony. He was sentenced to twenty years in state prison. Humberto testified as an eyewitness for the State at appellant's trial.

*Mendoza v. State*, 700 So.2d 670, 672 (Fla. 1997).

## II. STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a one-year limitations period for the filing of an application for relief under § 2254. Accordingly, 28 U.S.C. § 2244(d) provides:

(1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of State court. The limitation period shall run from the latest of -

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In most cases, including the present case, the limitation period begins to run pursuant to §2244(d)(1)(A). The Eleventh Circuit has decided that the judgment becomes "final" within the

meaning of § 2244(d)(1)(A) as follows: (1) "if the prisoner files a timely petition for certiorari, the judgment becomes 'final' on the date on which the Supreme Court issues a decision on the merits or denies certiorari, or (2) the judgment becomes 'final' on the date on which the defendant's time for filing such a petition expires." *Bond v. Moore*, 309 F.3d 770, 773-74 (11th Cir. 2002). The State has not argued that the petition is time barred. The Court proceeds to the merits.

### III. EXHAUSTION AND PROCEDURAL BARS

In response to Mr. Mendoza's petition, the State has argued that certain of his claims are unexhausted and procedurally barred from federal review. To exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the *state's highest court*. *Castille v. Peoples*, 489 U.S. 346, 351 (1989)(emphasis added). "When a petitioner fails to properly raise his federal claims in state court, he deprives the State of "an opportunity to address those claims in the first instance" and frustrates the State's ability to honor his constitutional rights." *Cone v. Bell*, 129 S.Ct. 1769, 1780 (2009)(internal citations omitted).

Ordinarily, a federal habeas corpus petition which contains unexhausted claims is dismissed pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982), allowing Mr. Mendoza to return to the state forum to present his unexhausted claim or claims. However, such a result in this instance would be futile, since Mr. Mendoza's unexhausted claim is now incapable of exhaustion at the state level and would be procedurally barred under Florida law. Mr. Mendoza has already pursued a direct appeal and filed his Rule 3.851 motion in state court, with the denial of the

4

motions affirmed on appeal.[2]  Because there are no procedural avenues remaining available in Florida that would allow Mr. Mendoza to return to the state forum and exhaust the subject claim, the claim is likewise procedurally defaulted from federal review. *Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990)(where dismissal to allow exhaustion of unexhausted claims would be futile due to state procedural bar, claims are procedurally barred in federal court as well).

Claims that are unexhausted and procedurally defaulted in state court are not reviewable by the Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent," as contemplated in *Murray v. Carrier*, 477 U.S. 478 (1986). *See House v. Bell*, 547 U.S. 518 (2006); *Dretke v. Haley*, 541 U.S. 386 (2004). *See also United States v.Frady*, 456 U.S. 152, 168 (1982). Since Mr. Mendoza has not established cause to excuse his default, it need not be determined whether he suffered actual prejudice. *See Glover v. Cain*, 128 F.3d 900, 904 n.5 (5th Cir. 1997).

## IV. PROCEDURAL HISTORY

Mr. Mendoza was convicted of first-degree murder, conspiracy to commit robbery, attempted armed robbery, armed burglary with an assault, and possession of a firearm during the

---

[2]In Florida, issues which could be but are not raised on direct appeal may not be the subject of a subsequent Rule 3.850 motion for post-conviction relief. *Kennedy v. State*, 547 So.2d 912 (Fla. 1989). Further, even if the subject claim was amenable to challenge pursuant to a Rule 3.850 motion, it cannot now be raised in a later Rule 3.850 motion because, except under limited circumstances not present here, Florida law bars successive Rule 3.850 motions. *See* Fla.R.Crim.P. 3.850(f). *See also Moore v. State*, 820 So.2d 199, 205 (Fla. 2002)(holding that a second or successive motion for postconviction relief can be denied on the ground that it is an abuse of process if there is no reason for failing to raise the issues in the previous motion).

commission of a felony. *Mendoza*, 700 So.2d at 673. By a seven-to-five vote, the jury

recommended the death penalty. The court imposed a sentence of death after finding the

following aggravating factors: (1) Mr. Mendoza was previously convicted of a violent felony;

and (2) the murder was committed while appellant was engaged in the commission of a robbery

and for pecuniary gain (merger of aggravators). *Id.* at 673. The court considered the mitigating

evidence presented but found "[t]he defendant has failed to establish the existence of any

statutory or nonstatutory mitigating circumstances." ([DE 18-24] at 29).[3] On August 2, 1994,

the court sentenced Mr. Mendoza to death.

On direct appeal, Mr. Mendoza raised nine issues at the Florida Supreme Court.

Mendoza argued that (1) the evidence at trial did not prove burglary as an
underlying crime to felony murder; (2) the trial court erred in allowing the
admission of the sworn prior consistent statement of Humberto Cuellar; (3) the
trial judge engaged in improper ex parte communications with jurors; (4) the trial

---

[3] This is the decision as quoted directly from the sentencing order. This statement is
confusing. It is confusing because the trial court analyzed Mr. Mendoza's two non-statutory
mitigation claims of "drug use and dependency" and "mental problems which do not reach the
level of statutory mitigating factors as defined in Fla. Statute §921.141(6)(L)" and stated that
"[t]he Court has considered and given minimal weight" to those two allegations. Yet, the court
ultimately concluded that "there was no credible evidence of this mitigating factor" or "[t]he
Court rejects this non-statutory mitigator." ([DE 18-24] at 26-27). Concluding that Mr. Mendoza
failed to establish these two mitigators while at the same time giving them minimal weight is
difficult to reconcile with the Florida capital sentencing scheme.

In Florida, the trial judge is required to first "consider whether the facts alleged in
mitigation are supported by the evidence." *Rogers v. State*, 511 So.2d 526 (Fla. 1987). Then,
"[i]f such factors exist in the record at the time of sentencing, the sentencer must determine
whether they are of sufficient weight to counterbalance the aggravating factors." *Id.* Therefore,
either Mr. Mendoza: (1) failed to establish his drug use and mental health issues or (2) he did
establish those two non-statutory mitigating factors but the court determined that only little
weight was to be assigned to them. It cannot be both. *See Ault v. State*, 53 So.2d 175, 195 (Fla.
2010)("The trial court set out the evidence, determined that the circumstance was both proved by
the evidence and mitigating, and assigned weight. This approach complies with the requirements
set out by this Court.").

court erred in denying three challenges for cause to prospective jurors based on their beliefs concerning the death penalty; (5) the trial court erred in excluding mitigation evidence; (6) the trial court erred in allowing the State to improperly impeach Mendoza's expert witness; (7) the trial court erred in finding the aggravating circumstance that the murder was committed for pecuniary gain; (8) the trial court erred in failing to adequately consider Mendoza's proposed mitigation; and (9) the death penalty is not proportional.

*Mendoza v. State*, 964 So.2d 121, 126, n.2 (Fla. 2007).  On October 16, 1997, the Florida

Supreme Court affirmed Mr. Mendoza's conviction and sentence.

Thereafter, Mr. Mendoza filed a Rule 3.850 postconviction motion.  Mr. Mendoza raised

twenty-seven claims.

(1) Mendoza had insufficient access to public records; (2) Mendoza was denied a fair trial due to the cumulative effects of ineffective assistance of counsel, withholding of exculpatory or impeaching material, newly discovered evidence, and improper trial court rulings; (3) the State withheld evidence that was exculpatory and material; (4) trial counsel was ineffective for failing to challenge jurors based on their biases toward the death penalty; (5) the State's arguments and the trial court's statements at trial presented impermissible considerations to the jury, misstated the law and facts, and were inflammatory and improper; (6) Mendoza was denied the right to an adequate mental health evaluation; (7) trial counsel failed to investigate and prepare mitigating evidence; (8) Mendoza is innocent of first-degree murder; (9) Mendoza is innocent of the death penalty; (10) incorrect penalty phase jury instructions were given by the trial judge; (11) the trial court gave erroneous instructions to the jurors on the standard by which they must judge expert testimony; (12) the jury received inadequate guidance on aggravating circumstances; (13) the State improperly introduced nonstatutory aggravating factors; (14) prosecutorial and judicial comments to the jury mischaracterized the importance of the jury's role; (15) Florida's rules prohibiting appellate counsel from interviewing jurors are unconstitutional; (16) trial counsel was ineffective for failing to object to the State's overbroad and vague arguments in aggravating circumstances; (17) execution by electrocution or lethal injection is cruel and unusual punishment; (18) Florida's capital sentencing scheme is unconstitutional; (19) pretrial publicity and failure to change venue denied Mendoza a fair and impartial jury; (20) the trial court erred in refusing to find and consider mitigating circumstances clearly set out by the record; (21) the trial court's sentencing order does not reflect an independent weighing or reasoned judgment; (22) Mendoza was denied a proper direct appeal because of omissions in the record; (23) it was unconstitutional for the judge and jury to consider

7

> Mendoza's prior conviction in the penalty phase; (24) the death sentence was
> predicated on an automatic aggravating factor; (25) the trial judge was not
> impartial; (26) Mendoza is insane to be executed; and (27) the jury venire was not
> properly sworn before trial.

*Id.* at 126, n.2.  The circuit court summarily denied the motion on January 26, 2001.  On appeal,

the Florida Supreme Court remanded.

> We have for review Mendoza's appeal from the circuit court's order summarily
> denying his Florida Rule of Criminal Procedure 3.850 motion. We vacate the
> circuit court's order and remand for an evidentiary hearing on the claims of
> ineffective assistance of counsel at the guilt and penalty phase of the original trial.
> The Chief Judge of the Eleventh Judicial Circuit shall appoint a new circuit court
> judge to preside over these proceedings. We dismiss Mendoza's petition for writ
> of habeas corpus without prejudice.

*Mendoza v. State*, 817 So.2d 848 (Fla. 2001).  A new circuit judge was appointed and, during a

period of almost a year, the court held six evidentiary hearings on this matter.  However, when

the court issued its order denying Mr. Mendoza's claims, it did so in a "very brief two-page order

which simply set out the standards from case law for ineffective assistance of counsel claims and

held: 'This Court finds that the Defendant's petition did not meet nor did it overcome the

requirements of the above-mentioned case law.' *State v. Mendoza*, No. F92–9940C (Fla. 11th

Cir. Ct. order filed Aug. 18, 2004)." *Mendoza*, 964 So.2d at 127.  Mr. Mendoza appealed this

denial asserting two claims and also petitioned for a writ of habeas corpus.  As to his Rule 3.850

postconviction denial, Mr. Mendoza again asserted that his defense counsel was ineffective at

both the guilt and penalty phases of trial.  In his petition for writ of habeas corpus, Mr. Mendoza

asserted that appellate counsel was ineffective for failing to assert the following claims on direct

appeal:

> (1) the trial court erred in limiting questioning regarding the victim's illegal
> activities; (2) the trial court erroneously denied the defense motion for mistrial

8

following the prosecutor's improper remarks about the death penalty; (3) the trial judge made improper comments during voir dire; (4) the State made a variety of improper comments in its closing arguments at the guilt and penalty phases of trial; (5) the trial court erred in not granting defense motions relating to the State's violation of the witness sequestration rule; (6) the trial court gave erroneous jury instructions regarding expert witness evidence; (7) various improper remarks were made by the prosecutor and trial judge about the jury's note-taking; (8) the trial judge's ex parte communication with jurors was improper; and (9) the trial court committed constitutional error in admitting evidence of pending robbery charges.

*Mendoza*, 964 So.2d at 127, n.4.  The Florida Supreme Court denied Mr. Mendoza's habeas petition but remanded the case back to the circuit court for written factual findings as to the Rule 3.850 motion.  Since the postconviction judge had died in the interim time between the denial of the Rule 3.850 motion and remand from the Florida Supreme Court, the court required new evidentiary hearings to be held and ordered the circuit court to render its order by "ruling on each claim considered at the evidentiary hearing and all other claims raised in the motion, making detailed findings of fact and conclusions of law with respect to each claim, and attaching or referencing such portions of the record as are necessary to allow for meaningful appellate review." *Id.* at 128, n.6.

Upon remand, the circuit court held the requisite hearings and then issued a detailed order denying relief. *Mendoza v. State*, 87 So.3d 644 (2011).  The Florida Supreme Court affirmed. *Id.*  Rehearing was denied May 7, 2012.  On May 18, 2012, Mr. Mendoza timely filed this petition for writ of habeas corpus. (DE 1).  This matter has been fully briefed and is ripe for review.

### *V. MR. MENDOZA'S CLAIMS AND APPLICABLE STANDARDS*

Mr. Mendoza's habeas corpus petition is governed by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified at various provisions in Title 28 of the U.S. Code), which significantly changed the standards of review that federal courts apply in habeas corpus proceedings.  Under the AEDPA, if a claim was adjudicated on the merits in state court, habeas corpus relief can only be granted if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  This is an "exacting standard."  *Maharaj v. Sec'y, Dep't. of Corr.,* 432 F.3d 1292, 1308 (11th Cir. 2005).

Pursuant to § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an] [opposite] result."  *Williams v. Taylor,* 529 U.S. 362, 405 (2000) (opinion of O'Connor, J., for a majority of the Court).  In other words, the "contrary to" prong means that " the state court's decision must be substantially different from the relevant precedent of [the Supreme] Court."  *Id.*

With respect to the "unreasonable application" prong of § 2254(d)(1), which applies when a state court identifies the correct legal principle but purportedly applies it incorrectly to the facts before it, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.  *See also Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003).  Significantly, an "objectively unreasonable application of federal law is

10

different from an incorrect application of federal law." *Woodford v. Visciotti,* 537 U.S. 19, 24-25 (2002). An "unreasonable application" can also occur if a state court "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head,* 268 F.3d 1223, 1241 (11th Cir. 2001).

As noted above, § 2254(d)(2) provides an alternative avenue for relief. Habeas relief may be granted if the state court's determination of the facts was unreasonable. "A state court's determination of the facts, however, is entitled to deference" under § 2254(e)(1). *See Maharaj,* 432 F.3d at 1309. This means that a federal habeas court must presume that findings of fact by a state court are correct; and, a habeas petitioner must rebut that presumption by clear and convincing evidence. *See Hunter v. Sec'y, Dep't. of Corr.,* 395 F.3d 1196, 1200 (11th Cir. 2005).

Finally, where a federal court would "deny relief under a de novo review standard, relief must be denied under the much narrower AEDPA standard." *Jefferson v. Fountain,* 382 F.3d 1286, 1295 n.5 (11th Cir. 2004). Even if the Court believed the Florida Supreme Court's determination to be an incorrect one, under AEDPA deference that alone is not enough to grant habeas relief, the Court must also find that "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Harrison v. Richter*, 131 S.Ct. 770, 783 (2011). In other words, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification* that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. *See id.* (emphasis added).

11

### *VI. ANALYSIS*

In his petition for federal habeas relief, Mr. Mendoza asserts three claims, with multiple sub-claims.  He argues that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when his attorneys provided ineffective assistance of counsel during the guilt and penalty phases of his trial.  Mr. Mendoza also asserts that appellate counsel was ineffective on direct appeal.

#### A.  Ineffective Assistance of Counsel During the Guilt Phase

Mr. Mendoza asserts that his counsel's performance was deficient during the guilt phase of his trial and that he was prejudiced by the deficiency.  Mr. Mendoza argues three specific deficiencies and also argues the cumulative effect of those deficiencies and the resulting prejudice. ([DE 1] at 20-52).

#### The *Strickland* Standard

Mr. Mendoza's claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). These claims are also governed by the deferential standards of the AEDPA.  In *Strickland*, the United States Supreme Court set forth the two-prong test that a convicted defendant must meet to demonstrate that his or her counsel rendered ineffective assistance.  First, a defendant "must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  Second, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  The Court defines a "reasonable probability" as one "sufficient to undermine confidence in the outcome."  *Id.*  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome

of the proceeding." *Id.* at 693.  There is no dispute that the clearly established federal law

applicable here is *Strickland v. Washington.*

> In *Strickland*, this Court made clear that "the purpose of the effective assistance
> guarantee of the Sixth Amendment is not to improve the quality of legal
> representation ... [but] simply to ensure that criminal defendants receive a fair
> trial." 466 U.S., at 689, 104 S.Ct. 2052. Thus, "[t]he benchmark for judging any
> claim of ineffectiveness must be whether counsel's conduct so undermined the
> proper functioning of the adversarial process that the trial cannot be relied on as
> having produced a just result." *Id.*, at 686, 104 S.Ct. 2052 (emphasis added). The
> Court acknowledged that "[t]here are countless ways to provide effective
> assistance in any given case," and that "[e]ven the best criminal defense attorneys
> would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.

*Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011).  The Court reviews Mr. Mendoza's claims

with the clearly established federal law of *Strickland* and its progeny while also applying

deference to the state court's decisions as required by the AEDPA.

At trial, Mr. Mendoza was represented by Arnaldo Suri, Esq. and Barry Wax, Esq.  Mr.

Mendoza's trial commenced on January 31, 1994. ([DE 18, Appx. W, Vol. 9] at 252).[4]  The guilt

phase concluded on February 8, 1994.  ([DE 18-59, Appx. W, Vol. 13] at 28).  The sub-claims

below involve the effectiveness of Mr. Suri and Mr. Wax during the guilt phase of Mr.

Mendoza's trial.

> *i. trial counsel asserted contradictory and inconsistent arguments to the jury as to the*
> *identity of the shooter.*

Mr. Mendoza asserts that his trial counsel was ineffective for first arguing that Humberto

Cueller was the shooter but then later arguing that, in fact, Humberto's brother, Lazaro Cueller

was the shooter. ([DE 1] at 24).  Mr. Mendoza also asserts that his counsel's performance was

---

[4] This volume of the record was not uploaded into the CM/ECF system but was provided
to the Court in a hard copy; therefore, the citation is different from the majority of the record
citations herein.

deficient because he failed to provide any "explanation to the jury for his inconsistent arguments." (*Id.* at 25). Mr. Mendoza contends that because the jury was presented with contradictory arguments, it "could have concluded nothing else but that Mr. Mendoza had no *bona fide* defense to the State's charges and that nothing trial counsel argued had any credibility or validity." (*Id.*). Mr. Mendoza implies that counsel's error in developing a consistent theory of defense was due to a lack of "proper investigation." (*Id.* at 27).

More importantly, on federal habeas review, Mr. Mendoza argues that the Florida Supreme Court's "decision resulted in a decision based on an unreasonable application of *Strickland* and an unreasonable determination of the facts." (*Id.* at 30). Mr. Mendoza asserts that the Florida Supreme Court failed to address the argument that the damage to Mr. Mendoza was that trial counsel should have simply not named the shooter. By naming the shooter first and then changing the identity of the shooter during trial, counsel caused "inevitable damage to the credibility of the defense team, and by inference that of Mr. Mendoza." ([DE1] at 30). Further, Mr. Mendoza argues that the court failed to analyze trial counsel's failure to properly investigate. Finally, Mr. Mendoza contends that strategic decisions that "are the result of an incomplete or incompetent investigation" cannot be considered reasonable. (*Id.* at 31). While Mr. Mendoza asserts multiple arguments for why his counsel was deficient, he does little to argue that he was prejudiced by these deficiencies.[5]

Mr. Mendoza first raised this claim in his Rule 3.850 postconviction motion. The circuit court denied the claim. On appeal, the Florida Supreme Court affirmed. After discussing the

---

[5] "Given that the jury already had significant and substantial reasons to doubt the veracity of Humberto's testimony, there is more than a reasonable probability that the outcome of the trial would have been different had counsel not been deficient." (DE 1 at 29).

14

role of the ABA Guidelines in evaluating claims of ineffective assistance of counsel in capital

cases, the court then analyzed the merits of Mr. Mendoza's claim.

> The Court need not decide whether trial counsel presented an inconsistent defense theory. We note that Mendoza did not establish that the defense theory of the case was that Humberto shot the victim. Rather, as testified to at the hearing by trial counsel, their strategy was that Mendoza did not fire the shot, and that the purpose of the confrontation with the victim was to collect a debt. While counsel's closing argument concerning who fired the gun differed from that made during his opening statement, there was evidence at trial supporting the defense theory that someone other than Mendoza, either Humberto or Lazaro, committed the murder.

> * * *

> In addition, the jury convicted Mendoza of first-degree felony murder. Thus, the identity of the shooter in this case was not material. *See Lowe v. State*, 2 So.3d 21, 30–31 (Fla.2008). Further, particularly as Mendoza presented no evidence at the evidentiary hearing to establish the shooter's identity, he has failed to make any demonstration that had counsel presented a consistent defense theory as to the identity of the shooter, codefendant Humberto Cuellar's trial testimony would have been discredited, and, as a result, the jury would have acquitted Mendoza of the underlying felonies.

> We affirm the denial of relief on this claim.

*Mendoza v. State*, 87 So.3d 644, 653-655 (Fla. 2011)(footnotes omitted).  The Court has

reviewed both the trial transcripts and the transcripts from the evidentiary hearings and finds that

this determination was reasonable.  Under these circumstances, Mr. Mendoza can satisfy the

"unreasonable application" prong of § 2254(d)(1) only by showing that "there was no reasonable

basis" for the Florida Supreme Court's decision.  *Harrington*, 131 S.Ct. at 784 (2011)("[A]

habeas court must determine what arguments or theories ... could have supporte[d] the state

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of this Court.")

*Id.* at 786.  The record on which the Florida Supreme Court based its decision is summarized

below.

### a. trial

In opening statements, Mr. Mendoza's counsel made clear that his defense was that the State had "absolutely no evidence that Marbel Mendoza shot anybody, or even that he had a gun on March 17th of 1992." ([DE 18, Appx. W, Vol. 9] at 27). Counsel argued that it was Humberto and Lazaro Cuellar who both had gunpowder residue on their hands when they were arrested. Counsel argued to the jury that the gun used to hit Mr. Calderon was "Lazaro Cuellar's gun, the other brother, the one who supposedly stayed in the car and who had gunpowder residue on his hands." (*Id.* at 610). Then counsel argued that Mr. Calderon "did fire his gun. Three shots. And who gets hit by that shot? Not Marbel Mendoza, but Humberto Cuellar, because *he's the one who did the shooting*. That's who Mr. Calderone shot." (*Id.* at 610).

In closing argument, however, Mr. Suri summarized the evidence presented during trial and made a single reference about the identity of the shooter.[6] "What I see is Humberto Cuellar and his brother, *who shot this man*, the evidence tells you he shot this man, the evidence tells you they all lied they all lied and got away with it." (*Id.* at 1332-33)(emphasis added). It is this inconsistency between the opening and closing argument that Mr. Mendoza argues was a deficient performance by counsel and what prejudiced him at trial.

### b. evidentiary hearing

At the evidentiary hearing on Mr. Mendoza's Rule 3.850 post-conviction motion both

---

[6] In his habeas petition, Mr. Mendoza also cites to a statement made by Mr. Wax, following the State resting its case wherein he said "[i]t's the defense theory of the case that Lazaro Cuellar shot and killed Conrado Calderon." ([DE 1] at 24). This statement was, in fact, made by Mr. Wax but it was made *outside the presence of the jury* during argument on proposed jury instructions. ([DE 18-57, Appx. W., Vol. 12] at 1225).

Mr. Suri and Mr. Wax testified. ([DE 18-102, 18-103, Appx. Z, Vol. 10-11] ).  Mr. Suri testified

first.

Upon inquiry as to the defense's theory of the case, Mr. Suri responded that because the

evidence was inconclusive, it "was extremely important to raise doubt in the guilt phase about

the possible shooters." (*Id.* at 43).  Mr. Suri did not have a specific recollection about the

identification of the shooter during his closing argument.  However, he did surmise that, at the

time, he thought is was Humberto Cuellar because Humberto "had been shot" and Lazaro

testified in deposition that "he stayed in the car" but "the evidence could have easily pointed to

the fact that either one of the Cuellar brothers was the shooter." (*Id.* at 46).  When asked about

the inconsistency between the identification of the shooter during opening statements and the

identity of the shooter during closing statements, Mr. Suri did not have a clear explanation.

> A.  I don't remember what I told them in closing argument.  Obviously, we
> thought Rao's testimony that there was gun powder residue on both Cuellar
> brothers to the point that suggested that they may have been the shooter which
> was important for us.  I don't know how I phrased it but the point was, I think I
> stated earlier we were trying to raise some doubt as to who the shooter was.

([DE 18-102, Appx. Z, Vol. 11] at 27).

Next, Mr. Wax testified.  Mr. Wax testified that he and Mr. Suri had conferred before the

case and had agreed that the theory of the case was as follows:

> Well, we determined early on that it looked very unlikely that we would be able to
> obtain an acquittal in the case and based upon felony murder theory that there
> would be very little chance that we would get a verdict to lesser included offense
> of first degree murder.
>
> So our theory in the case was to try to establish that Marbel was not the individual
> that shot the victim Mr. Calderon in this case and to try to establish that it was one
> of the Cuellar brothers who shot Mr. Calderon.

17

> It was their actions that precipitated Mr. Calderon being killed and since they had received plead [sic] negotiations to a lesser sentences [sic] that on a proportionality concept that we would be able to persuade a jury that a term of years or a life sentence would be appropriate.

([DE 18-102, Appx. Z, Vol. 12] at 48).  Based on this testimony, it is questionable whether Mr. Mendoza could show deficient performance; but, even if Mr. Mendoza could show that counsel's performance was deficient, Mr. Mendoza must show also prejudice.  *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)(both parts of the *Strickland* test must be satisfied, an insufficient showing on one part will settle the dispute.).  He has not done so.

To begin, this claim is an ineffective assistance of counsel during the *guilt* phase - not the *penalty* phase - of trial claim.  In order to show prejudice, Mr. Mendoza must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (i.e. that Mr. Mendoza would not have been convicted of first degree *felony* murder).  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  Given that Mr. Mendoza was convicted of a crime in which he did not need to be the shooter, he has not shown prejudice.  At trial, the judge instructed the jury as follows:

> Before you can find the defendant guilty of first degree felony murder, the state must prove the following three elements beyond a reasonable doubt:
>
> One, Conrado Calderon is dead.
>
> Two, (a) the death occurred as a consequence of and while Marbel Mendoza was engaged in the commission of attempted robbery and/or burglary or –
>
> (b) the death occurred as a consequence of and while Marbel Mendoza or an accomplice was escaping from the immediate scene of the attempted robbery or burglary or –

18

(c) the death occurred as a consequence of and while Marbel Mendoza or an accomplice was escaping from the immediate scene of the attempted robbery or burglary

Three, (a) Marbel Mendoza was the person who actually killed Conrado Calderon or –

(b) Conrado Calderon was killed by a person other than Marbel Mendoza, but both Marbel Mendoza and the person who killed Conrado Calderon were principals in the commission of the attempted robbery and/or burglary

In order to convict of first degree felony murder it is not necessarily for the state to prove that the defendant had a premeditated design or intent to kill.

([DE 18-58, Appx. W, Vol. 13] at 62).

Aside from the identity of shooter, the evidence presented at trial, most of it unrebutted, showed that Mr. Mendoza was involved in the plan and was present at the scene of the crime. The admission's clerk at the hospital testified that Mr. Mendoza was with Humberto Cuellar when he was admitted with a gunshot wound on the morning of the murder. ([DE 18, Appx. W, Vol. 9] at 730)[7]. Mr. Mendoza's finger and palm prints were found at the scene. ([DE 18-56, Appx. W, Vol. 11] at 65-66). Counsel conceded that the finger and palm prints found on the Cadillac at the crime scene were Mr. Mendoza's. (*See* [DE 18-58, Appx. W, Vol. 13] at 24). The evidence showed that Mr. Mendoza's phone number had been sent to Humberto Cuellar's pager on the day before and the day of the murder. ([DE 18- 53, Appx. W, Vol. 10] at 67). Following the murder, Mr. Mendoza moved to his mother's home and shaved his head. ([DE 18-53, Appx. W, Vol. 10] at 93-94). All of this evidence was separate and apart from the damning testimony of Humberto Cuellar.

There was more than enough evidence for the jury to have found Mr. Mendoza guilty of

---

[7] *See* Order, n.4

felony murder absent the actual identification of the shooter. Indeed, the prosecutor made this point clear in closing argument. "They planned this. They got together. They went there. And forget it, *let's say he's not the shooter*. He's guilty of first degree felony murder." ([DE 18-58, Appx. W, Vol. 12] at 39)(emphasis added). "*It doesn't matter whether or not he's the shooter*. I don't care because he's a principal. He's in on this whole thing." (*Id.*)(emphasis added).

Ultimately, Mr. Mendoza was convicted of first-degree *felony* murder. Therefore, counsel's failure to either: (1) correctly identify the shooter or (2) not identify the shooter by name but show it was not Mr. Mendoza did not create a reasonable probability that Mr. Mendoza would not have been convicted of first degree felony murder.[8]

Moreover, this claim is governed by 28 U.S.C. §2254(d). As the *Harrington* decision emphasized, because the inquiry is governed by AEDPA, the question is not just if counsel's decisions were reasonable, but whether fairminded jurists could disagree about whether the state court's denial of the ineffective assistance claim was inconsistent with Supreme Court precedent[9]

---

[8] Mr. Mendoza largely ignores the fact that he was convicted of felony murder in his petition. He certainly did not address the relation between his conviction and prejudice. In Florida, felony murder requires that Mr. Mendoza was "involved in the crime." *See Lowe v. State*, 2 So.3d 21, 30-31 (Fla. 2008)("Because there is physical and circumstantial evidence that demonstrates that Lowe was involved in the crime, the jury would have still found Lowe guilty of first-degree felony murder."). Mr. Mendoza did not confront this essential issue other than to assert a generalized argument that the deficiency effected the "credibility of the entire defense team." ([DE 22] at 10).

[9] In support of this claim, Mr. Mendoza cites *Bland v. California, Dep't of Corr.*, 20 F.3d 1469 (9th Cir. 1994)(overturned on other grounds). This is not binding precedent on this Court. More importantly, opinions from the Ninth Circuit are not clearly established federal law, as required by the AEDPA. In this context, "clearly established law" signifies "the holdings, as opposed to the dicta, of [United States Supreme] Court's decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Finally, *Bland* was decided before the enactment of the AEDPA in 1996 and was regarding a claim of error when a defendant has been denied the right to substitute counsel. Therefore, the Court does not find *Bland* applicable or persuasive.

or was based on an unreasonable determination of the facts. *See Harrington*, 131 S.Ct. at 785–86; 28 U.S.C. § 2254(d). In *Cullen v. Pinholster*, the United States Supreme Court recently reiterated that "[s]urmounting *Strickland*'s high bar is never an easy task" and that the *Strickland* standard must be applied with "scrupulous care." 131 S.Ct. 1388, 1408 (2011)(internal citations omitted). If fairminded jurists could reasonably disagree, then habeas relief should be denied. Here, the Court finds no error with the Florida Supreme Court's legal and factual determinations regarding this claim. Although, even if it had, any alleged errors would not have been beyond the possibility for fairminded disagreement. *See Harrington*, 131 S.Ct. at 786. ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer*, *supra*, at 75, 123 S.Ct. 1166."). Accordingly, habeas relief is denied.

*ii. trial counsel broke his promise to the jury in opening statements and failed to present available evidence that there was no attempted robbery by failing to call Lazaro Cuellar as a witness.*

Mr. Mendoza's second sub-claim for habeas relief is that his counsel told the jurors in opening statements that he was going to present Lazaro Cuellar as a witness to prove that there was no attempted robbery but then did not do so. (*See* [DE 1] at 32). Here, Mr. Mendoza asserts that Lazaro Cuellar would have testified that the contact made with the victim was "not to attempt a robbery, but to collect a debt" and that "he never saw Mr. Mendoza with a gun." ([DE 1] at 32)(emphasis omitted). Mr. Mendoza makes this assertion based on Lazaro Cuellar's deposition and testimony given at the postconviction evidentiary hearing. Mr. Mendoza contends that this testimony was essential because if there was no underlying felony (i.e. robbery or attempted robbery) then there can be no felony murder. Mr. Mendoza argues that his case is analogous to *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) and *Anderson v. Butler*, 858 F.2d 16

21

(1st Cir. 1988).[10]

Mr. Mendoza first raised this claim in his Rule 3.850 postconviction motion.  The trial court denied relief and the Florida Supreme Court affirmed.

> Mendoza next argues that trial counsel provided ineffective assistance when, though telling the jury during opening statement that he would present the testimony of codefendant Lazaro Cuellar at trial, he failed to do so. According to Mendoza, Lazaro Cuellar would have testified that there had been no attempted robbery.
>
> In denying this claim, the circuit court found that counsel did not present Lazaro Cuellar as a witness on the basis of trial strategy.
>
> * * *
>
> Mendoza failed to demonstrate that the rationale in which counsel believed he decided not to call Lazaro Cuellar was not supported by competent, substantial evidence. *See Burns v. State*, 944 So.2d 234, 242–43 (Fla. 2006). Nor did Mendoza establish that counsel's strategy was unreasonable under prevailing norms.
>
> Moreover, Mendoza failed to demonstrate that Lazaro Cuellar was an available witness at the time of trial. Lazaro testified at the evidentiary hearing that he would not have been willing to testify at Mendoza's trial. Mendoza's unsupported argument that Lazaro could have been compelled to testify is insufficient to satisfy his burden. To the contrary, testimony at the hearing reflected that the State was seeking to vacate Lazaro's sentence entered upon a plea agreement due to his inconsistent testimony in a deposition given in Mendoza's case on October 15, 1993. *See also Notice of Appeal, State v. Cuellar*, 657 So.2d 972 (Fla. 3d DCA 1995) (No. 94–1253) (State's notice of appeal filed on May 26, 1994, three months after Mendoza's conviction). Under the circumstances, Mendoza has not demonstrated that Lazaro could have been compelled to testify on Mendoza's

---

[10] Similar to the Court's analysis of *Bland*, *Harris* and *Anderson* are not binding precedent on this Court.  More importantly, opinions from the First and Seventh Circuits are not clearly established federal law, as required by the AEDPA.  In this context, "clearly established law" signifies "the holdings, as opposed to the dicta, of [United States Supreme] Court's decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Finally, *Harris* and *Anderson* were decided before the enactment of the AEDPA in 1996 and are factually distinguishable from Mr. Mendoza's claim.  Therefore, the Court does not find *Harris* or *Anderson* applicable or persuasive.

22

behalf at the time of trial. *See Metellus v. State*, 900 So.2d 491, 494 (Fla. 2005) ("[C]ompeting versions of 'the truth' amount to a substantial noncompliance with the terms of [a codefendant's] plea agreement and the trial court did not place [the codefendant] in double jeopardy when it resentenced him."). Mendoza has failed to demonstrate deficient performance or prejudice resulting from counsel's decision not to call Lazaro Cuellar as a witness. *See Melton v. State*, 949 So.2d 994, 1003 (Fla.2 006) ("If a witness would not have been available to testify at trial, then the defendant will not be able to establish deficient performance or prejudice from counsel's failure to call, interview, or investigate that witness.") (*quoting Nelson v. State*, 875 So.2d 579, 583 (Fla. 2004)).

The circuit court properly denied relief upon this claim.

*Mendoza*, 87 So.3d at 655-56. It is this decision which the Court must give AEDPA deference.

Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. *See Harrington*, 131 S.Ct. at 783. In order to prevail, Mr. Mendoza needs to establish that the Florida Supreme Court's determination was either a legal decision that involved an unreasonable application of clearly established federal law or it was a factual determination that was unreasonable in light of the evidence presented in the state court proceeding. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* at 687. Mr. Mendoza has not met this standard. The following is the record which was before the Florida Supreme Court when it rendered its decision.

### a. trial

Here are the critical facts. A large part of Mr. Mendoza's defense was that the underlying crime was not a robbery but was a debt collection; therefore, there can be no felony murder. At

trial, Mr. Mendoza sought to introduce evidence of Mr. Calderon's involvement with a bolito (gambling) operation. The trial judge initially granted the request but limited it to questions about the gambling operation and not any prior criminal charges. ([DE 18, Appx. W, Vol. 9] at 741).[11] However, during trial, the judge further limited his ruling to only knowledge of Mr. Calderone's bolito operations at the time of his death and not to any time prior to then. (*Id.*). Defense counsel moved for a mistrial and argued that "we are being forced to change our theory of defense in the middle of the case." (*Id.* at 747).

Later, when the defense was going to rest its case after not calling Lazaro Cuellar to testify, the State sought sanctions against defense counsel. ([DE 18-57, Appx. W, Vol. 12] at 30-31). The request for sanctions was based on certain evidentiary rulings made by the court due to defense counsel's representations that the defense would be calling Lazaro Cuellar. In response to the State's request, Mr. Wax made the following statement:

> Your Honor. I take exception with the state's position that this was calculated. We intended to call Lazaro Cuellar. That was our trial. Mr. Suri and I spoke extensively before the trial, and our position was that it would be to Mr. Mendoza's best interest if we did call Mr. Cuellar.
>
> As you know, when we concluded this trial we asked corrections if we could speak with Mr. Mendoza. We went to the jury room and spoke to Mr. Mendoza. The purpose of that was to discuss the possibility of calling Lazaro Cuellar to testify. After hearing the state's case, the defense made a *strategic decision* that it would be in Mr. Mendoza's best interest not to call Lazaro Cueallar [sic]. We felt that would be in his best interest. We made a *strategic decision* based on the state's case in chief not to call Lazaro Cuellar, and that is our right.
>
> With respect, if the state is asking for sanctions as to our making a decision in the middle of trial not to call the witness, that is entirely their choice to make, but it is inappropriate, Judge, because we are entitled to change our *strategy*.

---

[11] *See* Order at n.4.

> I think it's clear that we said we were going to prove that he was a bolitero, and we didn't prove that, and that is one of the reasons we wanted to call Lazaro Cuellar with respect to that.  We can't do it, Judge, so we are not calling him, and that is why sanctions are entirely inappropriate.

([DE 18-57, Appx. W, Vol. 12] at 31-32)(emphasis added).  Likewise, Mr. Suri also defended the defense's decision to not call Lazaro Cuellar.

> That's all it is, is that, and I would reiterate what Mr. Wax said so eloquently that last night we pondered and today we came to the decision, and that is our trial *strategy* that we decided upon.

> If you had told me at the beginning of the case is there any chance that Lazaro Cuellar would not have to come into this trial, I would have said no, but we evaluated the evidence and we don't need him.  We have gotten to the point that we are resting.

(*Id.* at 33)(emphasis added).  It was on this clear record that the Florida Supreme Court made the factual determination that counsel's decision to not call Lazaro Cuellar was a strategic one.

### b. evidentiary hearing

Mr. Suri and Mr. Wax also testified at the evidentiary hearing.  Both counsel confirmed, albeit with less clarity and conviction, that the decision not to call Lazaro Cuellar was a strategic one.  At the hearing, fourteen years after trial, Mr. Suri was again asked about why the defense did not call Lazaro Cuellar.  His response was as follows:

> Given what I said now about Lazaro could potentially could [sic] testify to in this case, the only thing that I can really come up with and this was a long time ago. This was a long time ago, is that we felt that we had raised some doubts as to who the shooter was and, you know even though Lazaro had - - if he testified consistent with his deposition he would have said Marbel didn't have a gun. There is also, you know, it's his brother involved, we thought I guess we thought that you know why take the chance that he would testify to something else.

> * * *
> I can't think of why we didn't do it.  I am trying to evaluate the case and the way I

25

looked at it and I've spoken to Ms. Seff about this and that is the only way that I can understand the decision that was made not to put on Lazaro.

That's what we were thinking. Correctly or incorrectly it turns out incorrectly but that was what we were thinking.

([DE 18-101, App. Z, Vol.10] at 56-57).   Mr. Wax also testified at the hearing.   When cross-examined by the State, Mr. Wax responded as follows:

Q: Do you recall now, that prior to making that decision [to not call Lazaro Cuellar] you went into either the jury room or somewhere in private and had a conversation with the defendant and Mr. Suri that you were not going to call Lazaro?

A: That appears to be what's reflected in the transcript but still I don't have a recollection of it still but the transcript indicates that and that was contemporaneous with the decision.

Q: Would you characterize that decision as done without thinking of all of the options that you had?

A: No.

Even the transcript reflects it was a *strategic* decision.

Q: Is it fair to say at this point you don't remember exactly the reason for that but it was a *strategic* decision?

A: That's correct.

([DE 18-102, Appx. Z, Vol. 10] at 84)(emphasis added).   Based on this record, the Court finds that the Florida Supreme Court's determination that counsel made a strategic decision was reasonable.

Indeed, counsel did make a strategic decision.   Counsel was clear in their representations to the court, at the time the decision was made during trial, that the decision not to call Lazaro

Cuellar was a strategic decision. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' but those made after 'less than complete investigation' are reasonable only to the extent that reasonable professional judgment supports the limitations on investigation." *Strickland*, 466 U.S. at 690–691. Given the record and the dynamics of the relationship between Humberto and Lazaro Cuellar, counsel's strategy to not call Lazaro Cuellar certainly could be viewed as a reasonable decision. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is whether some reasonable attorney could have acted in the circumstances . . . [as this attorney did]-whether what . . . [this attorney] did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689) (citation omitted). *See also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (stating that to show unreasonableness "a petitioner must establish that no competent counsel would have made such a choice.").

Moreover, defense counsel represented Mr. Mendoza before, during, and after trial. Counsel garnered all the crucial information that comes with being present during critical periods of a client's representation. Unlike a later reviewing court, counsel observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Strickland*, 466 at 689; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it

27

deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.

Under these circumstances, Mr. Mendoza can satisfy the "unreasonable application" prong of § 2254(d)(1) only by showing that "there was no reasonable basis" for the Florida Supreme Court's decision. *Harrington*, 131 S.Ct. at 784. ( "[A] habeas court must determine what arguments or theories ... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). *Id.*  As this is a *Strickland* claim analyzed under the deferential lens of §2254(d), the Court's review of the Florida Supreme Court's decision on deficiency is "doubly deferential." *See Knowles v. Mirzayance*,129 S.Ct. 1411, 1413 (2009).  Meaning that the Court must give deference to the strategic decisions of counsel and then also give deference to the decision of the Florida Supreme Court. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles*, 556 U.S., at ——, 129 S.Ct. at 1420." *Harrington*, 131 S.Ct. at 788.  After a thorough review of the state court record, the Court concludes that Mr. Mendoza has not established that the Florida Supreme Court's determination was unreasonable and it was his burden to do so.

Despite the well-reasoned opinion of the Florida Supreme Court, Mr. Mendoza urged the Court to grant habeas relief on this sub-claim.  He did so by mischaracterizing the record.  In his petition, Mr. Mendoza contended that "neither Mr. Suri nor Mr. Wax could articulate a reason as to why they did not call Lazaro Cuellar." ([DE 1] at 36).  This is simply not true.   At trial, Mr. Wax advised the judge "I think it's clear that we said we were going to prove that [Conrado

Calderon] was a bolitero, and we didn't prove that, and that is one of the reasons we wanted to call Lazaro Cuellar with respect to that. We can't do it, Judge, so we are not calling him..." ([DE 18-57, Appx. W, Vol. 12] at 32). Mr. Suri argued likewise, "but we evaluated the evidence and we don't need him. We have gotten to the point that we are resting." (*Id.* at 33). Mr. Mendoza did not cite nor attempt to distinguish this portion of the trial record. Simply, Mr. Mendoza failed to acknowledge its existence.

Even fourteen years after trial, Mr. Suri was still able to articulate a reason why he thought that the defense team had not called Lazaro Cuellar. "[I]t's his brother involved, we thought I guess we thought that you know why take the chance that he would testify to something else." ([DE 18-101, App. Z, Vol.10] at 56-57). Despite this record, Mr. Mendoza, in his reply, continued to inaccurately present by asserting "[n]owhere in the record of the trial or in the record of the instant post-conviction proceedings does counsel give any indication of the basis or rationale for their mutual decision." ([DE 22] at 13). Again, this is simply not so.

Mr. Mendoza also seems to assert that because counsel told the jury during opening statements that the defense would present Lazaro Cuellar, his counsel's performance was *per se* deficient for failing to do so. However, as counsel has clearly stated, it was the defense's intent to call Lazaro Cuellar to the stand but after the State's case, counsel made a strategic decision to not do so. Under Mr. Mendoza's argument, counsel would have to make a Hobson's choice.[12]

---

[12] "(1) an apparent freedom to take or reject something offered when in actual fact no such freedom exists : an apparent freedom of choice where there is no real alternative: (a) : the forced acceptance of something whether one likes it or not (as in a so-called free election where only one candidate is proposed); (b)(1) : the necessity of accepting something objectionable through the fact that one would otherwise get nothing at all (as an underpaid job rather than no job at all) (2) : the necessity of accepting one of two or more equally objectionable things (as enslavement or annihilation by a conquered people)." *Merriam Webster Third New International*

Either put on a witness who you have subsequently determined would be a strategic mistake because you referenced him in opening statements or do not put the undesirable witness on and be found to have rendered a deficient performance.  There is no precedent for this argument and the Court finds this assertion meritless.  *Strickland* recognizes that "[t]here are countless ways to provide effective assistance in any given case" and there comes a point where a defense attorney will reasonably decide that another strategy is in order. . ." 466 U.S. at 691.  Habeas relief is denied.[13]

### iii.  trial counsel was ineffective in preparing and presenting exculpatory evidence of gunshot residue.

Mr. Mendoza's third sub-claim for federal habeas relief is two-fold.  First, he asserts that his counsel was ineffective for failing to "prepare and investigate the evidence surrounding the gunshot residue swabs taken of Lazaro and Humberto at the hospital following the shooting." ([DE 1] at 41).  Second, Mr. Mendoza contends that his counsel failed "to provide Mr. Mendoza with competent expert assistance in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985)." ([DE 1] at 41).[14]

---

*Dictionary Unabridged*, http://mwu.eb.com/mwu (Accessed May 2, 2013).

[13] While the Florida Supreme Court also addressed Lazaro Cuellar's availability to testify, the Court determined that the trial court's deficiency analysis regarding counsel's strategic decisions and performance at trial was reasonable.  Therefore, the Court does not address the prejudice prong of the *Strickland* test.  The Court need not "address both components of the inquiry if the defendant makes an insufficient showing on one."  *Strickland* 466 U.S. at 697.

[14] Mr. Mendoza argues that this deficient performance affected the result in both the guilt and penalty phase of the trial.  The Florida Supreme Court did not address this argument.  It did not do so because it was not made on appeal. (*See* [DE 18-9, Appx. T] at 43-55).  Therefore, the Court will not address it in the first instance.  "[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief. For example, habeas petitioners may not present

Mr. Mendoza first raised this sub-claim in his Rule 3.850 postconviction motion.

Counsel testified at the postconviction evidentiary hearing. Both Mr. Suri and Mr. Wax admitted

that they did not retain an independent gun powder residue expert. Mr. Wax also conceded that

"Mr. Suri and I made a mistake" in regards to the examination of the gun powder residue analysis

and Dr. Rao. (*Id.* at 52). Nonetheless, the circuit court denied the motion. Mr. Mendoza then

argued this claim on appeal to the Florida Supreme Court. After summarizing the facts, the court

found that Mr. Mendoza had failed to show prejudice.

> We agree that Mendoza failed to demonstrate prejudice based upon counsel's
> failure to recognize that Rao and Gallagher identified different times that the
> swabbings were done. While Mendoza argues that counsel's deficient
> performance permitted the State to discredit the defense and then emphasize to the
> jury during closing argument that the defense attempted to mislead the jury, the
> jury convicted Mendoza of felony murder. Thus, the identity of the perpetrator
> who fired the gun was not relevant to the jury finding Mendoza guilty of
> first-degree murder. We affirm the denial of relief on this claim.

*Mendoza*, 87 So.3d at 657. The Court finds this determination reasonable. Just as the Court

agreed that Mr. Mendoza had not shown prejudice in his first sub-claim due to his counsel's

failure to provide a consistent theory of who the shooter was, Mr. Mendoza's third sub-claim

suffers a similar fate. (*See* Order *supra* at 18-20). Even assuming that counsel's performance

during the guilt phase was deficient, Mr. Mendoza has not shown that he was prejudiced. This is

fatal to his claim. Since a habeas petitioner must show both deficiency and prejudice, the Court

---

particular factual instances of ineffective assistance of counsel in their federal petitions that were
not first presented to the state courts." *Kelley v. Sec'y, Dep't. of Corr.*, 377 F.3d 1317, 1344
(11th Cir. 2004). The Eleventh Circuit has determined that "[w]e simply require that petitioners
present their claims to the state courts such that the reasonable reader would understand each
claim's particular legal basis and specific factual foundation." *Id.* at 1344-45. (citation omitted).
To assert for the first time that counsel's performance had an effect not only on the guilt phase
but also the penalty phase of trial is not a presentation of claims to the state courts as anticipated
by the holding of *Kelley*.

may dispose of a *Strickland* claim based on a determination that a defendant has failed to show either prong without considering the other. *See Strickland*, 466 U.S. at 697.

Mr. Mendoza was convicted of first-degree *felony* murder. This result is not dependant upon counsel proving whether or not the shooter was Humberto or Lazaro Cuellar. The evidence still showed Mr. Mendoza's involvement in the crime that ultimately resulted in the death of Mr. Calderon. Likewise, even if counsel had retained "competent expert assistance" as required by *Ake*, the best outcome for Mr. Mendoza would have been that the expert identified someone other than Mr. Mendoza as the shooter. The jury was instructed that Mr. Mendoza did not have to be the shooter to be found guilty of felony murder. An expert opinion showing precisely what the State asked the jurors to presume would not have created a reasonable probability of a different outcome. The Florida Supreme Court's decision was not unreasonable.

Finally, the Court is aware that Mr. Mendoza is asserting that the failure to prepare and investigate the evidence prior to presenting Dr. Rao at trial had a much broader effect on the outcome of the trial because this failure undermined the overall credibility of defense counsel. Mr. Mendoza avers that because the "evidence elicited at the guilt phase is frequently relevant not only to questions of guilt but also of penalty" that counsel's ineffectiveness can be evaluated by its effect on both phases of trial. ([DE 1] at 49). However, assuming that this argument could be raised here,[15] it is tenuous at best. To establish prejudice, the Petitioner must show more than simply the error had "some conceivable effect on the outcome of the proceeding." *Marquard v.*

---

[15] Again, this argument was not raised on appeal to the Florida Supreme Court. (*See* [DE 18-9, Appx. T] at 43-55). "The prisoner exhausts his state remedies by presenting his constitutional claim to the State courts, to afford them an opportunity to correct any error that may have occurred." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam). Mr. Mendoza did not do so. *See also*, Order, *supra* at n.12.

*Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1305 (11th Cir. 2005) (quotation omitted).  Habeas relief is denied.

*iv. cumulative error*

Mr. Mendoza's final sub-claim for habeas relief is that "this Court must examine and assess the cumulative effect of all counsel's errors." ([DE 1] at 52).   In support of this claim, Mr. Mendoza again cites law from outside this Circuit. (*Id.*).   He does so despite the fact that the law of this Circuit is well-settled.

A cumulative effects claim is not cognizable for federal habeas review except in very limited circumstances not applicable here.   When the Court engaged in a sub-claim by sub-claim analysis and has found each to be without merit, unless the trial was rendered fundamentally unfair, the Eleventh Circuit Court of Appeals has declined to entertain "cumulative error" claims. *See Cargill v. Turpin*, 120 F.3d 1366, 1386-87 (11th Cir. 1997).

The Florida Supreme Court has determined[16], and the Court agrees, Mr. Mendoza's trial was not rendered fundamentally unfair.   Further, as the Court has found no errors, there can be no cumulative error. *See United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004)(citing *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001)("If there are no errors or a single error, there can be no cumulative error")).   Habeas relief is denied.

**B. Ineffective Assistance of Counsel During the Penalty Phase**

---

[16] "The Court did not find trial error with respect to the guilt phase, and, as discussed above, Mendoza's individual claims of ineffective assistance of counsel at the guilt phase of trial are without merit. Mendoza has failed to demonstrate that he was denied a fair and impartial guilt phase of trial." *Mendoza*, 87 So.3d at 657.

Mr. Mendoza's second claim for federal habeas relief is that his counsel was ineffective during the penalty phase of his trial and that he was prejudiced. ([DE 1] at 52-90). He asserts three specific sub-claims. First, Mr. Mendoza contends that his trial counsel failed to investigate, discover, and present mitigation evidence. (*Id.* at 52). Second, Mr. Mendoza asserts that trial counsel "opened the door to allow the State to present evidence of Mr. Mendoza's pending charges for robbery with a firearm." (*Id.* at 88). Finally, Mr. Mendoza argues that trial counsel was ineffective for calling Humberto Cuellar was a witness. (*Id.* at 89).

   i. *trial counsel failed to investigate, discover and present mitigation evidence.*

Trial counsels' failure to investigate, discover and present mitigation evidence is the primary focus of Mr. Mendoza's penalty phase claims as he has devoted thirty-six of the thirty-eight page claim to this single issue. In his petition, Mr. Mendoza provided the Court with an extensive summary of the testimony both at trial and at the postconviction evidentiary hearing. Mr. Mendoza's argument is that his trial counsels' performance was deficient because "[a]s was established at the evidentiary hearing, [the failure to establish any mitigating factors] occurred not because Mr. Mendoza does not have mitigating factors in his life history and background, but because counsel was ineffective in not investigating, discovering, and presenting this evidence to the sentencing jury and judge." ([DE 1] at 53). Generally, Mr. Mendoza contends that his trial counsels' performance was deficient for failing to conduct a "complete investigation into Mr. Mendoza's background and mental health." ([DE 1] at 56). Specifically, Mr. Mendoza asserts that trial counsels' performance was deficient because they did not seek "funds to travel to Peru to investigate" nor did they attempt to obtain records from the Peruvian refugee camp. (*Id.* at

34

56). Mr. Mendoza also argues that counsel failed to provide the expert witness, Dr. Jethro

Toomer, with the records necessary to conduct a complete evaluation of him. Likewise, Mr.

Mendoza asserts that trial counsel failed to have the necessary neuropsychological and

neurological testing completed. In support of his claims, Mr. Mendoza draws attention to the

testimony given at the evidentiary hearing wherein trial counsel admitted that they were

unfamiliar with mitigation evidence having never done a death penalty sentencing hearing before

Mr. Mendoza's trial. (*Id.* at 56, 59, n.27). Finally, Mr. Mendoza contends that the Florida

Supreme Court "failed to conduct the kind of fact specific probing analysis mandated by *Porter*

and *Sears*, and therefore its application of *Strickland* was unreasonable. (*Id.* at 84). The Florida

Supreme Court issued its opinion denying this claim as follows:

> Upon careful review of both the penalty-phase transcript and the evidentiary
> hearing transcript, we agree with the circuit court that the jury and trial judge
> heard the childhood, medical, and psychological information that Mendoza
> alleged counsel failed to discover and present. As often stated, the presentation of
> cumulative evidence in the postconviction proceedings does not provide a basis
> for determining that trial counsel's performance was deficient. *Kilgore v. State*, 55
> So.3d 487, 504 (Fla.2010). Rather than the failure to investigate and present
> mitigating evidence, Mendoza takes issue with the manner in which trial counsel
> presented the evidence at trial. This is not, however, a proper basis to establish
> deficient performance on the part of trial counsel. *See Everett*, 54 So.3d at 478
> ("That there may have been more that trial counsel could have done or that new
> counsel in reviewing the record with hindsight would handle the case differently,
> does not mean that trial counsel's performance during the guilt phase was
> deficient.") (*quoting State v. Coney*, 845 So.2d 120, 136 (Fla.2003)). In addition,
> the fact that Mendoza later found an expert whose testimony may be more
> favorable as to the degree of his mental status impairment does not establish that
> trial counsel's investigation was deficient. *See Anderson v. State*, 18 So.3d 501,
> 512 (Fla.2009) (stating that trial counsel is not required to continue searching for
> an expert who will give a more favorable mental status assessment). Indeed,
> Mendoza's own legal expert testified at the evidentiary hearing that at the time of
> Mendoza's trial, he also had used Dr. Toomer as a mental health expert in a
> capital case.

*Mendoza*, 87 So.3d at 657-59. As the Florida Supreme Court identified *Strickland* and addressed

the merits, the Court can only grant habeas relief if it finds that the relevant state-court decision

was an unreasonable application of clearly established federal law or a unreasonable

determination of the facts in light of the evidence presented. *See* § 2254(d)(1)&(2). The

question under AEDPA is not whether a federal court believes the state court's determination

was incorrect but whether that determination was unreasonable—a substantially higher threshold.

*See Williams v. Taylor*, 529 U.S. 362 (2000). AEDPA also requires federal habeas courts to

presume the correctness of a state courts' factual findings unless applicants rebut this

presumption with "clear and convincing evidence." §2254(e)(1). Mr. Mendoza has not met this

burden. Below is a summary of the testimony given at the penalty phase, the *Spencer* hearing,

and the postconviction evidentiary hearing.

### a. the jury

During the penalty phase before the jury, defense counsel presented four witnesses. First,

Mr. Mendoza's mother, Nilia Mendoza, testified. ([DE 18-59, Appx. W, Vol. 13] at 107). Mrs.

Mendoza testified regarding Mr. Mendoza's drug use and certain details of the family's time in

Cuba, in Peruvian refugee camps, and the family's immigration to the United States. Mrs.

Mendoza also testified about Mr. Mendoza's two minor children and the specific health issues

suffered by his young daughter. The defense also had a physician's report about Mr. Mendoza

from Cuba admitted into evidence. ([DE 18-60, Appx. W, Vol. 14]). Likewise, counsel also had

Mr. Mendoza's department of corrections records admitted into evidence.[17] ([DE 18-60, Appx. W, Vol. 14] at 36). Humberto Cuellar, Mr. Mendoza's co-defendant, also testified. The purpose of his testimony was to show that Mr. Mendoza's intent was simply a robbery and there was no intention or plan to commit murder. ([DE 18-60, Appx. W, Vol. 14] at 51). Finally, the defense called Dr. Jethro Toomer.[18] ([DE 18-60, Appx. W, Vol. 14] at 57). Dr. Toomer testified as to Mr. Mendoza's history of psychiatric problems, chemical abuse, some degree of brain damage or impairment, and his recent deterioration. The State presented limited testimony in rebuttal. The jury recommended death by a vote of seven to five.

### b. the *Spencer* hearing

After the jury's recommendation, the trial court conducted a *Spencer* hearing.[19] At the time of the *Spencer* hearing, defense counsel had retained another expert, Dr. Jimen Einstein, to examine Mr. Mendoza. However, when the time came to call the doctor to testify, counsel instead submitted Dr. Einstein's written report. ([DE 18-63, Appx. W, Vol. 15] at 30-31). The State had previously deposed Dr. Einstein and that deposition transcript admitted into the record. In rebuttal, the State presented the testimony of Dr. Gisela Aguilar Fuentes, PhD. (*Id.* at 34). Dr.

---

[17] Gloria Porter, the records custodian from the jail, testified as to the authenticity of the record. ([DE 18-60, App. W, Vol. 14] at 36).

[18] Trial counsel also retained Dr. Leonard Haber who conducted an evaluation of Mr. Mendoza. ([DE 18-59, Appx. W, Vol. 13] at 54). The State filed a motion in limine to restrict the testimony of Dr. Haber due to the hearsay rule. The trial court reserved ruling but ultimately, defense counsel did not call Dr. Haber to testify. (*Id.* at 57).

[19] In Florida, the parties can present additional evidence before the sentencing judge that the sentencing jury did not consider. *See Spencer v. State*, 615 So.2d 688, 691 (Fla. 1993).

Fuentes is a neuropsychologist. Dr. Fuentes examined Mr. Mendoza and determined that he did

not suffer from a neurological impairment and to, the extent that Dr. Einstein found otherwise,

any discrepancies would have been the result of Mr. Mendoza not being fluent in English. Dr.

Einstein administered the tests in English while Dr. Fuentes administered the tests in Spanish.

(*Id.* at 49). At the conclusion of the testimony and after the submission of legal memoranda, the

trial court followed the jury's recommendation and sentenced Mr. Mendoza to death.

### c. post-conviction

Almost fifteen years later[20], the postconviction evidentiary hearing was held wherein Mr.

Mendoza presented the testimony of ten additional witnesses (both expert and lay witnesses).

Also, both of Mr. Mendoza's trial counsel testified. The testimony given during this hearing is

the basis of Mr. Mendoza's claim that his counsel was ineffective during the penalty phase.

Arnaldo Suri, Esq. and Barry Wax, Esq., counsel for Mr. Mendoza were the first to

testify. There are certain facts that are not in dispute. Counsel did not hire a mitigation

specialist. ([DE 18-101, Appx. Z, Vol. 10] at 39). Counsel did not travel to Cuba to investigation

possible mitigation evidence. (*Id.* at 65; [DE 18-102, Appx. Z, Vol. 11] at 55). Counsel did not

travel to Peru to investigate possible mitigation evidence. (*Id.* at 68; [DE 18-102, Appx. Z, Vol.

11] at 56). Counsel attributed these "shortcomings" to a lack of experience. (*Id.* at 69). Counsel

did request the court appointment of an addictionologist but that request was denied by the trial

---

[20] An evidentiary hearing was held in 2004, however, the trial judge wrote a very brief two-page order and the Florida Supreme Court remanded the case back to the circuit court for written factual findings as to the Rule 3.850 motion. Since the postconviction judge had died in the interim time between the denial of the Rule 3.850 motion and the remand from the Florida Supreme Court, the court required new evidentiary hearings to be held.

judge.  ([DE 18-102, Appx. Z, Vol. 11] at 91).

However, trial counsel did interview both Mr. Mendzoa and his mother extensively to

ascertain family and social history relating to Mr. Mendoza's life and upbringing.  ([DE 18-102,

Appx. Z, Vol. 11] at 13-14; *Id.* at 55).  Trial counsel had two expert witnesses appointed to

evaluate Mr. Mendoza for competency and two experts appointed to evaluate Mr. Mendoza for

any mental health disorders that could have been used in mitigation. ([DE 18-102, Appx. Z, Vol.

11] at 60-65).  Counsel testified that when he hired certain non-Spanish speaking experts, he did

so because "I respected them. And I felt they were good witnesses and they can impart their

information to the jury effectively." (*Id.* at 73).  Counsel testified that it had been their strategy

all along to show Mr. Mendoza to be not the actual shooter during the guilt phase so that when

guilt was apportioned at the penalty phase, he would be the least culpable. ([DE 18-102, Appx Z,

Vol. 11] at 22).  As it turned out, this strategy was unsuccessful.

Next, Mr. Mendoza called ten additional witnesses.  Three of those witnesses, Lionel

Perez, Celia Nartnett, and Steven Potolsky did not give substantive testimony.  Postconviction

counsel had intended to call Lionel Perez to testify regarding Mr. Mendoza's drug use during

high school but Mr. Mendoza refused to allow him to testify. ([DE 18-105, Appx. Z, Vol. 13] at

17).  Ms. Nartnett was going to testify regarding gunshot residue analysis but because she had not

conducted any substantive testing, her testimony was excluded by the trial judge. ([DE 18-107,

Appx. Z, Vol. 15] at 45).  Mr. Mendoza also offered the testimony of Steven Potolsky, Esq.

However, after voir dire, the trial court declined to accept Mr. Potolsky as expert in the field that

Mr. Mendoza was seeking to have him qualified. ([DE 18, Appx. Z, Vol. 13] at 840).[21]  Mr.

Potolsky's testimony was proffered into the record for appeal.  The remaining witnesses all

testified regarding Mr. Mendoza's mental health or social history.  There is certain testimony of

note.

       To begin, four of Mr. Mendoza's remaining witnesses were unlikely to have been able to

testify at the trial in 1994.  First, Dr. Eugenio Rothe, MD testified that Mr. Mendoza suffered

from mild posttraumatic stress disorder, attention deficits and polysubstance abuse. ([DE 18-103,

Appx. Z, Vol. 12] at 69).  However, it is unlikely that Dr. Rothe would have been available to

testify as an expert in 1994 because he was working at Guantanamo and specializing in disorders

of children and adolescents.  Moreover, he did not possess board certifications in specialized

fields of psychiatry until after Mr. Mendoza's trial.   Second, Lazaro Cuellar testified that he was

unwilling to testify in 1994.  ([DE 18-106, Appx. Z, Vol.13] at 12).  Third, Dr. Jethro Toomer

testified that it is preferable to have all the records before conducting the evaluation.  However,

in certain cases where the records are not located, an evaluation can still be done. ([DE 18-106,

Appx. Z, Vol. 13] at 47).  According to Dr. Toomer, Marbel Mendoza was "completely

processed." (*Id.*).  Therefore, the veracity of his testimony from 1994 was not in question.

Finally, Holly Ackerman, a librarian with an expertise in Latin America testified.  Dr. Ackerman

testified that she had traveled to Peru and conducted research on the Cubans living in the refugee

camps.  ([*Id.* at 57-58]).  However, Dr. Ackermen testified that she did not earn her PhD until

after Mr. Mendoza's trial in 1994. (*Id.* at 56).  Therefore, it is unlikely that she would have been

---

[21] *See* Order at n.4.

able to testify as an expert in 1994.  With the exclusion of these four witnesses, only four witnesses remain for the Court's consideration.

Dr. Ricardo Weinstein, psychologist, testified that Mr. Mendoza had an IQ in the 70's, compromised frontal lobe dysfunction, lack of adequate brain development and was under an extreme emotional disturbance at the time of the crime.  (*See* [DE 18-104, Appx. Z, Vol.11] at 44-68).  Also, Dr. Deborah Mash, neurologist/neuropsychiatrist testified that, in her opinion, Mr. Mendoza qualified for the statutory mitigator of extreme emotional disturbance. (*See* [DE 18-105, Appx. Z, Vol. 11] at 22).  Beatrice Roman, a United Nations worker, described the living conditions in the refugee camps in Peru, although she did not have a specific memory of Mr. Mendoza. ([DE-105, Appx. Z, Vol. 12] at 100).  Finally, Thomas Hyde, a behavioral neurologist, testified that Mr. Mendoza "did very well" on the mental status testing, his cognitive test was "fine", he scored "perfectly" on the Homomental State Exam (dementia screening), did not find any "abnormalities" in his mental status exam and the "limited general physical examination was unremarkable." ([DE 18-107, Appx. Z, Vol. 14] at 22-23).  It is with this testimony that Mr. Mendoza asserts that the Florida Supreme Court made an unreasonable determination of the facts and law.

As an initial matter, the Court finds a factual statement in the Florida Supreme Court's order to be inaccurate.  One of the bases for the court's denial of this claim was that "[r]ather than the failure to investigate and present mitigating evidence, Mendoza takes issue with the manner in which trial counsel presented the evidence at trial. This is not, however, a proper basis to establish deficient performance." *Id.* at 659.  This statement is incorrect.

41

On more than one occasion, Mr. Mendoza argued to the Florida Supreme Court that his counsel was "ineffective in not investigating, discovering, and presenting" evidence to the judge and jury. (*See* [DE 18-68, Appx. X, Vol. 23] at 3-20 & [DE 18-9, Appx. T] at 56; *see also id.* at 57, 60, 65 & 78). The Florida Supreme Court's determination of this issue is directly refuted by the record.

Nonetheless, the court also found that "the fact that Mendoza later found an expert whose testimony may be more favorable as to the degree of his mental status impairment does not establish that trial counsel's investigation was deficient." *Mendoza*, 870 So.3d at 659. While not entirely obvious, the state supreme court did ultimately analyze the claim on merits; therefore, the Court must consider the clearly established federal law at the time of the decision in 2011. We have defined "clearly established Federal law, as determined by the Supreme Court of the United States," to encompass "the holdings ... of this Court's decisions *as of the time of the* relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (emphasis added).

It goes without saying that the clearly established federal law governing this claim is *Strickland* but the United States Supreme Court had several other opportunities to consider ineffective assistance of counsel during the penalty phase of a condemned person's trial since *Strickland . See Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), *Sears v. Upton*, 130 S.Ct. 3259 (2010), *Porter v. McCollum*, 558 U.S. 30 (2009), *Wong v. Belmontes*, 558 U.S. 15 (2009), *Bobby v. Van Hook*, 558 U.S. 4 (2009), *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003). As this was also clearly established law at the time of Mr. Mendoza's appeal to the Florida Supreme Court, the court should have considered these cases in making its

determination. "The starting point for cases subject to § 2254(d)(1) is to identify the "clearly established Federal law, as determined by the Supreme Court of the United States" that governs the habeas petitioner's claims." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). Having reviewed these cases, the Court cannot conclude that Mr. Mendoza has met his burden under the AEDPA. Mr. Mendoza's case is factually distinguishable in significant ways from all the relevant precedent. Therefore, the Florida Supreme Court's determination was reasonable.

In 2003, the United States Supreme Court considered the effectiveness of counsel during the penalty phase of Kevin Wiggins' capital sentencing proceedings. During the proceedings counsel "introduced no evidence of Wiggins' life history." *Wiggins*, 539 U.S. at 515. Rather, counsel focused the jury on the fact that Mr. Wiggins had no prior criminal history. However, during post-conviction it was discovered that Mr. Wiggins had suffered greatly during his life.

> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. *Id.*, at 166a-167a. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization. *Id.*, at 167a-171a. At the age of six, the State placed Wiggins in foster care. Petitioner's first and second foster mothers abused him physically, *id.*, at 175a-176a, and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him. *Id.*, at 176a-179a. At age 16, petitioner ran away from his foster home and began living on the streets. He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion. *Id.*, at 190a. After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor. *Id.*, at 192a.

*Wiggins*, 539 U.S. at 516-17. The Court found that defense counsel had failed to conduct a reasonable investigation into Mr. Wiggins' life history before making a strategic decision to not

43

put on mitigation other than the fact that Mr. Wiggins had no prior convictions.   The Court also found that the state court's factual determination that this information was contained in Mr. Wiggins' social service records was incorrect by "clear and convincing evidence." *Id.* at 528.  It is clear that Mr. Mendoza's case is distinguishable from Mr. Wiggins.  While counsel for Mr. Mendoza did not travel to Cuba or Peru to ascertain additional mitigation evidence, they did retain two expert witnesses[22] to testify regarding Mr. Mendoza's mental state and had his mother testify to his social history.  Further, counsel did obtain the juvenile medical records for Mr. Mendoza regarding his mental health during the time he lived in Cuba as a child.  Given the vast differences between Mr. Mendoza and Mr. Wiggins' penalty phases, the Florida Supreme Court's determination was not an unreasonable application of clearly established federal law.

Two years after *Wiggins*, the United States Supreme Court again analyzed *Strickland* and its application during the penalty phase of a capital trial.  *See Rompilla*, 545 U.S. at 384.  In Mr. Rompilla's case, defense counsel did not review his prior convictions or his prison file despite knowing that the State was planning on using those convictions as an aggravating circumstance. *Id.*  Moreover, Mr. Rompilla's prison file contained a vast amount of social history including:

> "Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands,

---

[22]  Counsel attempted to retain a third expert; an addictionologist, but the trial court denied this request.  However, counsel did seek such an expert and should not be found to be deficient for failing to put on a witness who likely was available but the trial judge would not appoint.

fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags." 355 F.3d, at 279 (dissenting opinion) (citations omitted).

*Rompilla*, 545 U.S. at 391-92. None of this information was presented to the jury or the mental

health experts who examined Mr. Rompilla before trial.   The Supreme Court found that this

inaction was deficient under *Strickland* and prejudice resulted but Mr. Rompilla's social history

is vastly different from Mr. Mendoza's.  While it is true that having additional expert and fact

witnesses may have brought additional credibility to his mitigation, the testimony given at Mr.

Mendoza's postconviction hearing was not undiscovered evidence as was Mr. Rompilla's.  The

Florida Supreme Court found that the evidence presented at the evidentiary hearing was

cumulative.  The Court agrees.  The postconviction witnesses testified with a greater analysis and

more depth but they did not uncover any specific crucial facts which counsel would have and

should have known if they had done a more complete and thorough investigation.  Again, the

Court finds Mr. Mendoza's case factually distinguishable and the Florida Supreme Court's

determination of deficiency was a reasonable interpretation of federal law.  "Given the strong

presumption in favor of competence, the petitioner's burden of persuasion-though the

presumption is not insurmountable-is a heavy one." *Chandler*, 218 F.3d at 1314.  "The

presumption impacts on the burden of proof and continues throughout the case, not dropping out

just because some conflicting evidence is introduced. 'Counsel's competence ... is presumed, and

the [petitioner] must rebut this presumption by proving that his attorney's representation was

unreasonable under prevailing professional norms and that the challenged action was not sound strategy.' *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986) (emphasis added) (citations omitted)." *Id.* at n.15. Here, the presumption has not be rebutted.

In 2009, the Supreme Court considered ineffective assistance of counsel during the penalty phase in three separate cases. First, the Court decided *Bobby v. Van Hook,* 558 U.S. 4 (2009). After review, the Sixth Circuit Court of Appeals granted Mr. Van Hook habeas relief (for the third time) by applying the guidelines published by the American Bar Association in 2003 to the facts of Mr. Van Hook's case. *Id.* at 7. The Court reversed the opinion of the Sixth Circuit after finding that the incorrect ABA standards (2003) were applied in the analysis of Mr. Van Hooks claims and also that counsel did not conduct an unreasonable investigation nor did they wait until the last minute to prepare for the penalty phase. *Id.* at 9.

> Between Van Hook's indictment and his trial less than three months later, they contacted their lay witnesses early and often: They spoke nine times with his mother (beginning within a week after the indictment), once with both parents together, twice with an aunt who lived with the family and often cared for Van Hook as a child, and three times with a family friend whom Van Hook visited immediately after the crime. App. to Pet. for Cert. 380a–383a, 384a–387a. As for their expert witnesses, they were in touch with one more than a month before trial, and they met with the other for two hours a week before the trial court reached its verdict. *Id.*, at 382a, 386a. Moreover, after reviewing his military history, they met with a representative of the Veterans Administration seven weeks before trial and attempted to obtain his medical records. *Id.*, at 381a, 386a. And they looked into enlisting a mitigation specialist when the trial was still five weeks away. *Id.*, at 386a.

*Id.* at 9. Armed with this knowledge, counsel was able to present mitigation to the trial court. Specifically, counsel was able to show that both of Van Hook's parents were heavy drinkers, that Mr. Van Hook began drinking as a toddler and went barhopping and did drugs with his father

46

from an early age, that his home was considered a "combat zone" with his father physically and sexually abusing his mother in front of him, that Mr. Van Hook was forced out of the military, had attempted suicide on five different occasions including the month before the murder, and that Mr. Van Hook has borderline personality disorder which was exacerbated by his drug and alcohol use. Therefore, when the Supreme Court reviewed this information against the argument that counsel should had "reason to suspect that much worse details existed" and should have interviewed more family members, it rejected such a contention because "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative and the search for it distractive from more important duties." *Id.* at 11. The Florida Supreme Court reached a similar conclusion in Mr. Mendoza's case. *Mendoza*, 87 So.3d at 659. The Florida Supreme Court applied the proper legal standard and made a reasonable determination of the facts; therefore, habeas relief must be denied. During the penalty phase, the jury learned that Mr. Mendoza had fled Cuba with his parents to a refugee camp in Peru and the conditions in the camp were inadequate. The jury also heard that Mr. Mendoza abused substances, both legal and illegal, and likely suffered from brain damage or impairment. The jury heard that Mr. Mendoza had mental health issues and was treated by a doctor when he resided in Cuba for psychological issues. Given the record, the Court cannot find that the Florida Supreme Court's determination was unreasonable. While it may be true that more could have been done, perfection is not required. *See Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689) (citation omitted). *See also Provenzano v. Singletary*, 148 F. 3d 1327, 1332 (11th Cir. 1998) (stating that to show unreasonableness "a petitioner must establish

47

that no competent counsel would have made such a choice."). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). *See also Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). Clearly, Mr. Mendoza's counsels' conduct fell within the range of reasonable professional assistance.

Next, the Court considered *Wong v. Belmontes*, 558 U.S. 15 (2009). In *Belmontes,* the Court reversed the grant of habeas relief from the Ninth Circuit because it found that Mr. Belmontes had not established prejudice. At the penalty phase, trial counsel put on nine witnesses who testified to Mr. Belmonte's social and familial history, including his "terrible" childhood. *Id.* at 21. These witnesses testified that Mr. Belmontes' "father was an alcoholic and extremely abusive. Belmontes' grandfather described the one-bedroom house where Belmontes spent much of his childhood as a 'chicken coop.' Belmontes did not do well in school; he dropped out in the ninth grade. His younger sister died when she was only 10 months old. And his grandmother died tragically when she drowned in her swimming pool." *Id.* In addition, family members testified that Mr. Belmontes maintained strong family relationships. Other witnesses detailed Mr. Belmontes religious conversion in custody and Mr. Belmontes himself testified and accepted responsibility. However, counsel was limited in his ability to put on character evidence because of an uncharged murder case which the trial judge had ruled would

48

come into evidence if Mr. Belmontes "opened the door." In particular, this ruling precluded trial counsel from presenting an expert witness to explain his behavior at the time of the crime due to his mental state. Therefore, the Supreme Court analyzed prejudice by reviewing the evidence that was presented, the evidence which could have been presented but wasn't based on a strategic decision by counsel, and comparing the evidence not presented with the damage that would have been done to Mr. Belmontes' mitigation had the State been allowed to present evidence of a prior brutal murder to which Mr. Belmontes had later confessed. *Id.* at 24-26. The Court also reviewed additional testimony which would have been largely cumulative of the evidence that was presented. After weighing the mitigating evidence presented against the strong aggravation set forth by the State, the Supreme Court concluded that Mr. Belmontes did not satisfy the prejudice prong of *Strickland*. While the Florida Supreme Court did not reach the prejudice prong[23], the Court cannot conclude based on the analysis of cumulative evidence in *Belmonte* that the Florida Supreme Court's decision was an unreasonable application of clearly established federal law. "As a federal habeas court, we are not applying *Strickland* de novo, but rather through the additional prism of AEDPA deference. Thus, under this doubly deferential standard, '[t]he pivotal question is whether the state court[s'] application of the *Strickland* standard was unreasonable. And if, at a minimum, fair minded jurists could disagree about the correctness of

---

[23]  In Mr. Mendoza's case, the Florida Supreme Court found that counsel's performance was not deficient because the evidence he asserts that counsel should have presented would have been cumulative. Whereas, in assessing prejudice in *Belmonte*, the Court found that the cumulative evidence would have been of "insignificant benefit" and therefore a "reasonable probability that a jury presented with this additional mitigation evidence would have returned a different verdict" did not exist.

the state court[s'] decision, the state court[s'] application of *Strickland* was reasonable and AEDPA precludes the grant of habeas relief.'" *Morris v. Secretary, Dept. of Corrections*, 677 F.3d 1117, 1126, n. 2 (11th Cir.2012) (noting in footnote 2 that standard set out in text with regard to performance prong of *Strickland* also applies to the prejudice prong).

Finally, in November 2009, the Supreme Court decided *Porter v. McCollum*, 558 U.S. 30 (2009). In *Porter*, defense counsel presented only one witness, Mr. Porter's ex-wife, and read an excerpt from one deposition. *Id.* at 32. However, at the postconviction evidentiary hearing, counsel presented "extensive mitigating evidence" including evidence that "described [Mr. Porter's] abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity." *Id.* On *de novo* review of the deficiency prong, the Court found that Porter's counsel's performance clearly fell below the established norms which required counsel to conduct a thorough investigation of the defendant's background. *Id.* at 39. In preparation for the penalty phase, counsel for Mr. Porter conducted "only one short meeting" with his client. Counsel did not obtain any of his school, medical or military service records. Counsel also did not interview any of Porter's family. This complete failure to investigate is not analogous to Mr. Mendoza's case.

Here, Mr. Suri testified during the postconviction evidentiary hearing that he spent more time with the defendant than he has on any other case during his career. He testified that "I don't think a week or two passed that I wouldn't go see him...I barely sleepy [sic] so I'd get up very early, Sunday mornings to talk him [sic]. So, we developed a relationship, you professional [sic] as well as you know, very friendly I think within the context as much as possible with the terrible

situation that we were in." ([DE 18-101, Appx. W., Vol. 10] at 71). While logistically difficult at the time, counsel did obtain a medical file for Mr. Mendoza from his treatment during the time he lived in Cuba. Counsel retained a total of three mental health experts to evaluate Mr. Mendoza and sought the appointment of an addictionologist. During postconviction, Mr. Mendoza failed to produce documents or witnesses at the postconviction evidentiary hearing who would have provided information pertinent to avenues for additional investigation. Unlike Mr. Porter, Mr. Mendoza has failed to show that there was a wealth of mitigation evidence which counsel failed to pursue. Rather, his argument appears to be that there were "better" witnesses who would have testified to similar facts and circumstances which were already in front of the jury. Therefore, the Court does not find the Florida Supreme Court's rejection of this claim to be unreasonable.

Less than a year after *Porter*, the United States Supreme Court again considered ineffective assistance of counsel during the penalty phase of a capital trial. *See Sears v. Upton*, 130 S.Ct. 3259 (2010). Similar to the line of cases before it, *Sears* presented a factual scenario wherein the jury was told one thing during the penalty phase when the truth was far from the picture painted in mitigation. "During the penalty phase of Sears' capital trial, his counsel presented evidence describing his childhood as stable, loving, and essentially without incident. Seven witnesses offered testimony along the following lines: Sears came from a middle-class background; his actions shocked and dismayed his relatives; and a death sentence, the jury was told, would devastate the family." *Id.* at 3261-62. Reality, it was learned during the postconviction evidentiary hearing, was quite different.

51

The mitigation evidence that emerged during the state postconviction evidentiary hearing, however, demonstrates that Sears was far from "privileged in every way." Sears' home life, while filled with material comfort, was anything but tranquil: His parents had a physically abusive relationship, Exh. 26, 6 Record 1676 (Affidavit of Demetrius A. Sears), and divorced when Sears was young, Exh. 22, *id.*, at 1654 (Affidavit of Virginia Sears Graves); he suffered sexual abuse at the hands of an adolescent male cousin, Exh. 26, *id.*, at 1681–1682; his mother's "favorite word for referring to her sons was 'little mother fuckers,' " Exh. 3, 2 Record 265 (Affidavit of Richard G. Dudley, Jr., MD); and his father was "verbally abusive," Exh. 37, 6 Record 1746–1747 (Affidavit of Carol Becci–Youngs),FN3 and disciplined Sears with age-inappropriate military-style drills, Exh. 3, 2 Record 263–264; Exh. 19, 6 Record 1622 (Affidavit of Frank Sears); Exh. 22, *id.*, at 1651; Exh. 28, *id.*, at 1694 (Affidavit of Kenneth Burns, Sr.). Sears struggled in school, demonstrating substantial behavior problems from a very young age. For example, Sears repeated the second grade, Exh. 6, 3 Record 500–501, and was referred to a local health center for evaluation at age nine, Exh. 7, *id.*, at 503, 504, 508. By the time Sears reached high school, he was "described as severely learning disabled and as severely behaviorally handicapped." Exh. A to Exh. 1, 2 Record 174–176 (Affidavit of Tony L. Strickland, M. S., Ph. D.).

> FN3. In the particular instance recounted in this affidavit, Sears' art teacher stated that his father "berate[d][him] in front of" the school principal and her during a parent-teacher conference. Exh. 37, 6 Record 1746. The event was significant: "I'll never forget the way he bullied him," the art teacher explained, "Mr. Sears was so verbally abusive and made such a scene, that it made everyone in the room uncomfortable." *Ibid.* The art teacher had "never been in a conference where a parent severely criticized a child in the presence of his teachers and meant it, as Mr. Sears did." *Id.*, at 1747.

Environmental factors aside, and more significantly, evidence produced during the state postconviction relief process also revealed that Sears suffered "significant frontal lobe abnormalities." Exh. 1, *id.*, at 147. Two different psychological experts testified that Sears had substantial deficits in mental cognition and reasoning— i.e., "problems with planning, sequencing and impulse control," *ibid.*—as a result of several serious head injuries he suffered as a child, as well as drug and alcohol abuse. *See* 1 Record 37–40 (Testimony of Dr. Strickland); *id.*, at 95–96 (Testimony of Dr. Dudley). Regardless of the cause of his brain damage, his scores on at least two standardized assessment tests placed him at or below the first percentile in several categories of cognitive function, "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli." Exh. 1, 2 Record 148; see also 1 Record 37. The assessment also revealed that Sears' "ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired." Exh. 1, 2 Record 149. From an etiological standpoint, one expert

> explained that Sears' "history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected" to lead to these significant impairments. *Id.*, at 150; see also 1 Record 44.

*Id.* at 3262-63. Clearly, the facts of Mr. Mendoza's case regarding the differences between evidence presented at trial and the evidence presented in postconviction, are distinguishable from *Sears* such that the Florida Supreme Court's denial of this claim was not an unreasonable application of clearly established federal law. "[U]nder § 2254(d)(1), an 'unreasonable application of ... Federal law' occurs (1) when the state court's decision does not square with Supreme Court rulings on 'materially indistinguishable facts.'" *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

Finally, two months before the Florida Supreme Court decided Mr. Mendoza's case, the United States Supreme Court decided *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). In *Pinholster*, the Court determined the limitations on a federal habeas court from considering evidence not in the state court record at the time the state court considered the claim and then reviewed Mr. Pinholster's claim of ineffective assistance of counsel during the penalty phase on its merit. It is the latter of which is relevant here.

During his postconviction proceedings, Mr. Pinholster asserted that his trial counsel was ineffective during the penalty phase of his capital trial because "they should have pursued and presented additional evidence about: his family members and their criminal, mental, and substance abuse problems; his schooling; and his medical and mental health history, including his epileptic disorder." *Pinholster*, 131 S.Ct. at 1404. The record reflected that while trial counsel for Mr. Pinholster did some investigation and preparation for the penalty phase (i.e.

meeting with Mr. Pinholster's mother and brother, contacting a psychiatrist and doing research on epilepsy), he ultimately chose to mount a defense based on a procedural error made by the State and to create sympathy for Mr. Pinholster's family. Further, the expert that trial counsel had consulted examined Mr. Pinholster but concluded that he did not show significant signs or symptoms of mental disorder or defect other than his "psychopathic personality traits." *Id.* at 1405. Given the facts of Mr. Pinholster's case, the Court found that it was a reasonable strategic decision to pursue family-sympathy as mitigation. *Id.* at 1405. When considering the presumption of competence mandated by *Strickland*, the Court considered "the standard of professional competence in capital cases that prevailed in Los Angeles in 1984." *Id.* at 1407. At that time, the defense bar in California was using family-sympathy mitigation defense; therefore, trial counsel's defense was consistent with professional standards at the time of Mr. Pinholster's trial. Moreover, the Court found that even if trial counsel's performance had been deficient, Mr. Pinholster was unable to show prejudice.

Considering the facts and legal conclusions of *Pinholster*, the Court does not find the Florida Supreme Court's denial of Mr. Mendoza's claim to be an unreasonable application of clearly established federal law. In addition to the fact that Mr. Mendoza's counsel arguably conducted a more thorough investigation than that of Mr. Pinholster, it was also established during Mr. Mendoza's postconviction hearings that it would not have been standard practice at the time of his trial to travel to Cuba to investigate mitigation. ([DE 18-101, Appx. Z, Vol. 10] at 9-11). Indeed, Mr. Mendoza's own legal expert witness proffered testimony which showed that he himself had not traveled to Cuba nor did he hire a mitigation specialist in a similar death

54

penalty case around the same time as Mr. Mendoza's trial.  ([DE 18, Appx. Z, Vol. 13] at 840).

Finally, like in *Pinholster*, trial counsel for Mr. Mendoza had consulted with a second expert

before the penalty phase but found that the doctor's conclusions were not helpful to the defense.

([DE 18-102, Appx. Z, Vol. 10] at 65-66).  Therefore, counsel made a strategic decision not to

present the witness.  In light of the foregoing, the Court cannot conclude that the Florida

Supreme Court's decision was unreasonable.  The standard of review is "doubly deferential"

when "a *Strickland* claim [is] evaluated under the § 2254(d)(1) standard." *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009). "The question is not whether a federal court believes the

state court's determination under the *Strickland* standard was incorrect but whether that

determination was unreasonable—a substantially higher threshold." *Id.*  Habeas relief is denied.

### ii. *trial counsel opened the door to allow the State to present evidence of Mr. Mendoza's pending charges for robbery with a firearm.*

Mr. Mendoza's second sub-claim for habeas relief is that counsel was ineffective for

eliciting testimony from Dr. Jethro Toomer which allowed the State to present evidence of Mr.

Mendoza's pending robbery charges. ([DE 1] at 88).  Mr. Mendoza alleges that "[h]ad counsel

thought through its presentation of Dr. Toomer, this would never have been allowed to happen."

(*Id.* at 89).  The Florida Supreme Court reviewed and denied this claim as procedurally barred.

*Mendoza*, 87 So.3d at 660 ("Mendoza failed to properly raise this claim before the circuit court

in his rule 3.851 motion.  Accordingly, the claim is not reviewable for the first time on appeal.

*See Hutchinson*, 17 So.3d at 703 n. 5.  We deny this claim as procedurally barred. *See Franqui v.*

*State*, 965 So.2d 22, 32 (Fla.2007)")[24].

 Mr. Mendoza fails to mention this determination in the instant petition for writ of habeas corpus.  In response to the petition, the State asserted that because the Florida Supreme Court found this claim was procedurally barred, this Court must (absent special circumstances not argued here) deny the claim.  In his reply, Mr. Mendoza failed to respond to the State's assertion nor did he otherwise attempt to overcome this procedural bar.  Claims that are unexhausted and procedurally defaulted in state court are not reviewable by the Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent," as contemplated in *Murray v. Carrier*, 477 U.S. 478 (1986).  *See House v. Bell*, 547 U.S. 518 (2006); *Dretke v. Haley*, 541 U.S. 386 (2004); and *United States v. Frady*, 456 U.S. 152, 168 (1982).

 The Court has reviewed Mr. Mendoza's Amended Motion to Vacate Judgments of Conviction and Sentence. ([DE 18-67, 68, Appx. X, Vol. 2]).  The Florida Supreme Court's determination was correct.  In his Rule 3.850 Motion, Mr. Mendoza asserted the argument about the jury becoming aware of Mr. Mendoza's pending trial as one of trial error and prosecutorial misconduct. (*Id.*).  Mr. Mendoza did not assert this claim as one of ineffective assistance of

---

 [24] The court was correct in that motions to set aside a death sentence are filed under Florida Rule of Criminal Procedure 3.851, not 3.850. However, Mr. Mendoza filed a Rule 3.850 motion because his amended motion was filed prior to October 1, 2001, the effective date of Rule 3.851. The differences between Rule 3.850 and Rule 3.851 do not change the result here.

counsel in his Rule 3.850 motion. Therefore, in Florida, he could not raise this claim on appeal.

It is easy to understand how his claims in the Rule 3.850 Motion and his instant petition are different. Mr. Mendoza's amended motion to vacate was filed on September 5, 2000. This is the operative motion. ([DE 18-67, Appx. X, Vol. 2]). However, his case was twice remanded back to the trial court from the Florida Supreme Court with instructions to conduct an evidentiary hearing. Ultimately, the evidentiary hearing which concluded the postconviction process at the trial level was conducted in 2008. Following the hearing, Mr. Mendoza filed a Post Evidentiary Hearing Closing Argument and Memorandum of Law. ([DE 18-97, Appx. Z, Vol. 7]). It is in this memorandum where Mr. Mendoza asserted the precise arguments that the Florida Supreme Court found procedurally barred because these arguments were not included in the actual motion for post-conviction relief. At that point in time, Mr. Mendoza had been represented several different postconviction attorneys and it appears than Mr. Mendoza's arguments had changed or been reevaluated over the eight years between the filing of the motion and the conclusion of the evidence.[25]   Regardless, the Florida Supreme Court determined that this claim was procedurally

---

[25] The record shows that after the first evidentiary hearing in 2004, counsel for Mr. Mendoza made these arguments in his memorandum of law. ([DE 18-83, Appx. Y, Vol. 6] at 92). The State responded that the "[d]efendant did not claim, in his post conviction motion, that his trial counsel was ineffective for opening the door to evidence of Defendant's other criminal activity." ([DE 18-84, Appx. Y, Vol. 6] at 200). In reply, Mr. Mendoza asserted that while this claim was not "specifically asserted in the rule 3.850 motion. The State ignores that, at the evidentiary hearing, this issue was explored in detail with trial counsel without objection by the State." ([DE 18-84, Appx. Y, Vol. 6] at 242). Rather than address the procedural bar when making this same argument again in 2008, counsel simply raised this same argument without addressing or attempting to excuse the procedural bar. Again, in 2008, the State asserted the same contention. Specifically, the State asserted that Mr. Mendoza had not raised this claim in his postconviction motion. ([DE 18-98, Appx. Z, Vol. 8] at 99). In reply, Mr. Mendoza asserted a virtually identical argument to the one that he made in 2004. ([DE 18-99, Appx. Z, Vol. 8] at

defaulted.

As a general rule, a federal habeas court may not review state court decisions on federal claims that rest on state law grounds, including procedural default grounds, that are "independent and adequate" to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Here, the Florida Supreme Court expressly denied this claim as procedurally barred.[26] The Florida Supreme Court cited several cases where this procedural default rule had been regularly applied under Florida law. As the initial denial was based on a state procedural rule, this bar

---

45). On appeal to the Florida Supreme Court, the State asserted, for the second time, that this claim was procedurally barred. ([DE 18-10, Appx. U] at 90-91). Likewise, Mr. Mendoza again asserted that because this "issue was explored in detail with trial counsel without objection by the State" then the issue should be preserved for review. ([DE 18-11, Appx. V] at 35). The Florida Supreme Court rejected this argument and denied this claim as procedurally barred. *Mendoza*, 87 So.3d at 660.

[26] In the alternative, the Florida Supreme Court denied the claim on its merit. However, that does not change the result here. *See Parker v. Sec'y, Dep't .of Corr.,* 331 F.3d 764, 774-75 (11th Cir. 2003).

> In light of the Court's resolution of the substantive issue on direct appeal, Mendoza's attempt to raise this claim as one of ineffective assistance is improper. As explained in *Conde v. State*, 35 So.3d 660 (Fla.2010), "[b]ecause this Court has already held that the exclusion of [the witness's] testimony was harmless error, [defendant] cannot establish prejudice in his ineffective assistance of counsel claim." *Id.* at 664 (*citing Cox v. State*, 966 So.2d 337, 347–48 (Fla.2007)).FN12. The claim is denied.
>
> > FN12. As noted on direct appeal, were the case remanded for a new penalty phase, "the State would be entitled to introduce as aggravating factors appellant's subsequent guilty pleas and sentences in four other cases for multiple counts of robbery, aggravated battery, kidnapping, and firearms offenses." *Mendoza*, 700 So.2d at 678 n. 2 (citing cases). The same holds true here.

*Mendoza*, 87 So.3d at 661.

precludes this Court from reviewing the claim on the merits.  Further, as Mr. Mendoza did not

address the procedural bar in any of the briefs filed with the Court, he did not assert that there

was cause or prejudice to excuse the default.

> We are precluded from considering Philmore's *Batson* claim because "the last
> state court rendering a judgment in the case clearly and expressly state[d] that its
> judgment rests on a state procedural bar." *Parker v. Sec'y for the Dep't of Corr.*,
> 331 F.3d 764, 771 (11th Cir.2003) (quotation marks and citation omitted). A
> federal habeas claim may not be reviewed on the merits where a state court
> determined, as here, that the petitioner failed to comply with an independent and
> adequate state procedural rule that is regularly followed. *See Siebert v. Allen*, 455
> F.3d 1269, 1271 (11th Cir.2006). We must abide by the Florida Supreme Court's
> decision, even though the court made an alternative merits ruling. *See Parker*, 331
> F.3d at 774–75 (explaining that "an alternative merits holding leaves the
> procedural bar in place").
>
> Furthermore, Philmore does not argue that there is any cause or prejudice to
> excuse his procedural default. *See Siebert*, 455 F.3d at 1272. The requisite cause
> "ordinarily turns on whether the prisoner can show that some objective factor
> external to the defense impeded counsel's efforts to comply with the State's
> procedural rule." *Id.* (quotation marks and citation omitted). In the absence of any
> argument or evidence that cause and actual prejudice exists, we conclude that
> Philmore fails to satisfy this equitable exception to the procedural bar doctrine.

*Philmore v. McNeil*, 575 F.3d 1251, 1260 (11th Cir. 2009).   The state procedural bar to the

Court considering this claim remains.  Habeas relief as to this sub-claim is denied.

*iii.  trial counsel was ineffective for calling Humberto Cuellar as a witness in the penalty phase.*

Mr. Mendoza's final sub-claim for habeas relief is that trial counsel was ineffective for

calling Humberto Cuellar as a witness in the penalty phase.  ([DE 1] at 89).  Mr. Mendoza asserts

that counsel's ineffectiveness "did nothing but needlessly prop-up the credibility of Humberto

and his version of events that the intent was to commit a robbery, and further diminish the

credibility of Mr. Mendoza and his counsel." (*Id.* at 89).  Moreover, Mr. Mendoza argues that

since the State conceded that the conviction was purely for felony murder, Humberto Cuellar's

testimony was unnecessary and served no purpose. (*Id.*).

Similar to Mr. Mendoza's second penalty phase sub-claim, the Florida Supreme Court

also found this claim to be procedurally barred. "Mendoza did not raise this claim before the

circuit court as is now argued. Accordingly, having been raised for the first time on appeal, the

claim is denied as procedurally barred. *See Franqui*, 965 So.2d at 32." *Mendoza*, 87 So.3d at 661

(footnote omitted). While this sub-claim differs slightly from his second sub-claim, in that Mr.

Mendoza did, at least, raise a variation of this sub-claim in his amended postconviction motion, it

does not alter the result.

In his amended motion for postconviction relief, Mr. Mendoza argued as follows:

> Not only was trial counsel ineffective for not presenting available evidence that
> Mr. Mendoza did not intend to commit robbery, trial counsel inexplicably did
> the opposite. Trial counsel called Humberto Cuellar to testify at the penalty
> phase hearing. Not unexpectedly, Humberto testified, as he did during his
> testimony during the guilt/innocence phase, that they did indeed intend to rob
> Mr. Calderon. R. 1548). Thus, trial counsel effectively concede the
> contemporaneous felony/pecuniary gain aggravator.

([DE 18-68, Appx. X, Vol. 2] at 18). This argument is different from the argument made his

2008 Post Evidentiary Hearing Closing Arguments and Memorandum of Law wherein Mr.

Mendoza argued:

> Trial counsel was also ineffective for calling Humberto Cuellar as a witness in
> the penalty phase. Counsel called Humberto Cuellar as a witness in the penalty
> phase in order to have him testify that they never intended or planned on
> shooting Mr. Calderon (EH 6/9/08, p. 160). This was a complete disaster for
> Mr. Mendoza as counsel's direct examination of Humberto did nothing but
> needlessly prop-up the credibility of Humberto and his version of events and
> make it appear to the jury that the defense, in the end, accepted Humberto's

testimony as the truth of what occurred that night.

\* \* \*

Counsel needlessly allowed Humberto to bolster is [sic] credibility by eliciting this testimony as a witness called by defense counsel. Counsel's conduct in this matter was clearly ineffective for each of these reasons.

([DE 18-97, Appx. Z, Vol. 7] at 114, 116).  A comparison of the two arguments show that the Florida Supreme Court's determination was correct.  Mr. Mendoza did not raise this claim, in form or substance, in his amended motion for postconviction relief.[27]  The Florida Supreme Court applied an independent and adequate state law ground which regularly applied to claims raised for the first time on appeal and the Court must abide by that decision.  The Eleventh Circuit Court of Appeals has concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law.  *Whiddon v. Dugger,*

---

[27]  Nonetheless, the Florida Supreme Court analyzed the claim as made in the 2002 amended motion *and* as argued in the 2008 memorandum of law and determined that both arguments were without merit.

Mendoza did not raise this claim before the circuit court as is now argued. FN13 Accordingly, having been raised for the first time on appeal, the claim is denied as procedurally barred. *See Franqui*, 965 So.2d at 32. Moreover, the jury previously found Mendoza guilty of attempted armed robbery. Mendoza does not address how he was prejudiced where trial counsel in essence accepted the jury's verdict and attempted to demonstrate that Mendoza did not intend to commit murder, what the jury presumably would have seen as the more egregious act.

FN13. Mendoza argued in his amended postconviction relief motion that by presenting Humberto Cuellar's testimony at the penalty phase, trial counsel effectively conceded the contemporaneous felony/pecuniary gain aggravator. There is no question, however, that the jury previously convicted Mendoza of attempted armed robbery.

*Mendoza*, 87 So.3d at 661.

894 F.2d 1266, 1267-68 (11th Cir.1990). Therefore, habeas relief is denied.

### C. Ineffective Assistance of Appellate Counsel

In his third claim for relief, Mr. Mendoza argues that he received ineffective assistance of counsel during the direct appeal of his conviction and sentence. ([DE 1] at 90). Mr. Mendoza asserts that his appellate counsel neglected to raise fundamental issues which would have resulted in Mr. Mendoza receiving "a new trial, or at a minimum, a new penalty phase." (*Id.* at 91). Specifically, Mr. Mendoza contends that his appellate counsel was ineffective for failing to: (1) "raise on direct appeal the argument that the trial court committed reversible error by prohibiting the defense from presenting evidence of the victim's past involvement running bolito operations;" (2) "raise on direct appeal the argument that Mr. Mendoza was denied a fair trial when the trial court denied his motion for mistrial predicated on the court's mid-trial reversal of its pre-trial ruling on the extent to which the defense could present evidence of the victim's involvement in illegal bolito operations;" and (3) "raise the fundamental error which occurred due to the state's improper introduction of nonstatutory aggravating factors." (*Id.* at 91, 98 & 101). Mr. Mendoza first raised these sub-claims in his state petition for writ of habeas corpus. The Florida Supreme Court denied relief. Since the Florida Supreme Court considered the merits of Mr. Mendoza's claims, this Court must apply AEDPA deference to the court's decision.

Claims of ineffective assistance of appellate counsel are governed by the standard articulated in *Philmore v. McNeil*:

> In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." *Id.* at 1130-31. Rather, an effective attorney will weed out weaker arguments, even though they may have merit. *See id.* at 1131. In order to establish

62

prejudice, we must first review the merits of the omitted claim. *See id.* at 1132.
Counsel's performance will be deemed prejudicial if we find that "the neglected
claim would have a reasonable probability of success on appeal." *Id.*

575 F.3d 1251, 1264-65 (11th Cir. 2009).  For the reasons that follow, Mr. Mendoza's three sub-

claims of ineffective assistance of appellate counsel are denied.

*i. prohibiting evidence of the victim's past*

In his first sub-claim for relief, Mr. Mendoza asserts that his appellate counsel was

ineffective for failing to argue that "the trial court committed reversible error by prohibiting the

defense from presenting evidence of the victim's past involvement running bolito operations."

([DE 1] at 91).  Mr. Mendoza contends that this information was "relevant to the material issue

of Mr. Mendoza's intent (specifically, his lack of intent) to commit the alleged underlying

felonies that formed the basis of the felony murder charge." (*Id.*).  The facts are as follows.

Before the guilt phase of the trial, the State moved *in limine* to exclude any evidence

regarding Mr. Calderon's "prior arrest for racketeering in which he received a withhold of

adjudication." ([DE 18-31, Appx. W, Vol.14] at 5).  The trial judge granted the motion but stated

on the record that he would allow defense counsel "to ask either of the police officers if they

knew he was a bolitero or involved in a bolito operation" and if defense counsel wanted "to call

the wife or son, they can ask them if they knew or know that the victim was a bolito operator."

([DE 18-31, Appx. W, Vol. 14] at 19-20).  The trial court limited the questions to a witness'

personal knowledge and without any reference to prior arrests.

However, during trial, the trial judge revised his limitations on this questioning and only

allowed defense counsel to ask questions about whether or not Mr. Calderon was a bolitero *at the*

*time of his murder*. (*See* [DE 18-53, Appx. W, Vol. 16] at 20)(emphasis added).  Mr. Mendoza

63

argues that this decision was error and his counsel should have raised it on direct appeal.

Appellate counsel's failure to do so, according to Mr. Mendoza, constituted deficient

performance for which he was prejudiced.  Mr. Mendoza argued that he was entitled to state

habeas relief on this claim.  The Florida Supreme Court disagreed.

> First, Mendoza argues appellate counsel was ineffective for failing to raise the
> issue on appeal that the trial court erred in denying the defense motion to present
> evidence of the victim's participation in bolito. FN8 Evidence is generally
> admissible at trial, provided it is relevant. It is true that when evidence tends in
> any way to establish a reasonable doubt as to the defendant's guilt, it should be
> admitted. *Rivera v. State*, 561 So.2d 536, 539 (Fla.1990). "However, the
> admissibility of this evidence must be gauged by the same principle of relevancy
> as any other evidence offered by the defendant." *Id.* Relevant evidence is defined
> as "evidence tending to prove or disprove a material fact." § 90.401, FLA. STAT.
> (1995).
>
> > FN8. According to arguments made at trial and at the evidentiary hearing, "bolito" is
> > an illegal lottery. Evidence that the victim was a bolitero, or ran the lottery, was
> > claimed to be a critical part of the defense theory.
>
> Mendoza argues that evidence that the victim was a bolitero was improperly
> excluded because it supported his defense to the robbery charges that Mendoza
> and the Cuellars' purpose in approaching the victim on the day of the murder was
> to collect a debt. However, we find that Mendoza's argument is without merit
> because he has failed to demonstrate that this evidence is relevant to his claim of
> innocence to the robbery conviction. Even if Mendoza was able and had been
> permitted to prove that the victim was a bolitero or that he was known to be one,
> such evidence would not have tended to prove a relevant fact. From the fact that
> the victim was a bolitero it could not be lawfully inferred that Mendoza or the
> Cuellars ever made a loan to the victim or that their purpose in going to the
> victim's house was to collect a debt. That inference would require stacking one
> inference upon another, which we decline to do. *See Merck v. State*, 664 So.2d
> 939, 942 (Fla.1995) (defendant could not demonstrate evidence was material or
> exculpatory without impermissibly stacking inferences). Appellate counsel is not
> ineffective for failing to raise a meritless issue on direct appeal, and we therefore
> deny this claim.

*Mendoza v. State*, 964 So.2d 121, 130 (Fla. 2007).  The Florida Supreme Court found that the

underlying claim would have been meritless; therefore, counsel was not ineffective for failing to raise this as a claim on direct appeal. The Court must review this decision for reasonableness.

In order to determine counsel's deficiency for failing to make an argument it must be understood whether or not counsel should have known that this argument had a basis in law and fact and would not be considered meritless. *See Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir. 1989) ("[S]ince these claims were meritless, it was clearly not ineffective for counsel not to pursue them."); *Owen v. Sec'y, Dep't of Corr.*, 568 F.3d 894 (11th Cir. 2009). After reviewing Florida law at the time of Mr. Mendoza's trial and considering the standards for deficient performance, the Court then must apply AEDPA deference to the Florida Supreme Court's rejection of this claim pursuant to *Strickland.* Applying these standards, Mr. Mendoza cannot prevail on this sub-claim.

Under Florida law, character evidence is generally inadmissible at trial. §90.404(1) FLA. STAT. (1995). Specifically for victims, only pertinent character evidence is admissible. §90.404(1)(b)(1) FLA. STAT. (1995). Character evidence of a victim is deemed "pertinent" only when the victim's conduct is a material issue. *Hayes v. State*, 581 So. 2d 121, 126 (Fla. 1991) (holding that the trial court did not abuse its discretion by barring evidence of the victim's recent drug consumption because it was not relevant to any material issue on the facts of the case). The standard of appellate review for the admission of evidence is abuse of discretion. *Gunsby v. State*, 574 So. 2d 1085, 1088 (Fla. 1991) (holding there was no abuse of discretion, and therefore no trial court error, when trial court denied cross-examination of medical witness relating to drugs detected during victim's autopsy).

During the hearing on the State's motion *in limine*, the defense outlined its theory of the case: that Mr. Mendoza and the Cuellar brothers' purpose in approaching Mr. Calderon on the day of the murder was to collect a debt, rather than to commit a robbery as the State alleged. ([DE 18-31, Appx. W, Vol. 14] at 13).   Under this theory, the defense would present evidence that linked Mr. Calderon to past and current bolito operations, lending support to their theory that Mr. Mendoza approached Mr. Calderon to collect a debt.   However, Mr. Mendoza was unable to present such evidence based on the court's ruling.

Mr. Mendoza argues here that appellate counsel was ineffective for failing, on direct appeal, to assert that the trial court erred in preventing the defense from presenting character evidence regarding Mr. Calderon's past involvement in bolito operations.   Mr. Mendoza argues this evidence was material to his defense; that he approached Mr. Calderon to collect a debt when the murder occurred.   Therefore, Mr. Mendoza asserts that this testimony was improperly excluded.   This argument lacks merit.

The fundamental problem with Mr. Mendoza's assertion is that he has failed to demonstrate that Mr. Calderon's involvement in bolito operations at *any* point time was material to his defense or dispositive of his claim of innocence as to the robbery conviction.   While Mr. Mendoza may have been able to prove that Mr. Calderon had been involved in bolito operations, such evidence would not be sufficient to conclusively establish that Mr. Mendoza or the Cuellar brothers "ever made a loan to the victim or that their purpose in going to the victim's house was to collect a debt." *Mendoza v. State*, 964 So. 2d 121, 130 (Fla. 2007).   To infer that Mr. Mendoza's purpose with Mr. Calderon at the time of the murder was to collect a debt based

solely on evidence that Mr. Calderon had been involved in bolito operations at any point in time

would require impermissibly stacking one inference upon another. *See Merck v. State*, 664 So.

2d 939, 942 (Fla. 1995) (defendant could not demonstrate evidence was material or exculpatory

without impermissibly stacking inferences). Applying Florida law, the trial court did not abuse

its discretion by granting the State's motion *in limine* to prohibit any direct mention of Mr.

Calderon's prior racketeering arrest and withhold of adjudication because such victim character

evidence was not material to Mr. Mendoza's defense to the robbery conviction and was

inadmissable under §90.404(1)(b)(1).

Therefore, it was not unreasonable for the Florida Supreme Court to have denied this sub-

claim. "A lawyer cannot be deficient for failing to raise a meritless claim." *Freeman v. Atty.*

*Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). In order for Mr. Mendoza to prevail on his claims,

he "must show that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 787. Mr.

Mendoza has not done so. Habeas relief is, therefore, denied.

### ii. trial court's reversal of its pretrial ruling

In his second sub-claim for relief Mr. Mendoza asserts that his appellate counsel was

ineffective for failing to argue on direct appeal that the trial court erred when it reversed its initial

ruling on the admissibility of Mr. Calderon's alleged bolito operation.

The Florida Supreme Court denied this sub-claim because:

> Mendoza also claims that the trial court should have granted the defense motion
> for mistrial after it altered its ruling on the admissibility of this evidence and that

appellate counsel was ineffective for not raising this issue on appeal. Before trial, the court granted the State's motion in limine to prevent the defense from introducing evidence of the victim's arrest for racketeering. The trial judge stated at that time, however, that he did not have a problem with defense counsel asking the victim's wife whether the victim was a bolitero. Later, however, the trial judge limited the defense counsel's questioning of the victim's wife and police officers to whether they knew if the defendant was a bolitero at the time of his death. The trial judge denied the defense's motion for mistrial based on this evidentiary ruling.

We find that the trial judge's subsequent ruling did not significantly alter his original ruling on this evidence; he simply clarified that witnesses could only testify to information within their personal knowledge that the victim was a bolitero at the time of this crime. Therefore, the motion for mistrial was properly denied, and appellate counsel was not ineffective for failing to raise this issue on direct appeal.

*Mendoza*, 964 So.2d at 130.

In Florida, ruling on a motion for mistrial is within the sound discretion of the trial court. *Power v. State*, 605 So.2d 856, 861 (Fla. 1992). A motion for mistrial should be granted only when it is necessary to ensure that the defendant "receives a fair trial." *Cole v. State*, 701 So.2d 845, 853 (Fla. 1997) (citing *Power*, 605 So.2d at 861). In reviewing a motion for mistrial, the trial court must "exercise great care and caution" and should only grant the motion "in cases of absolute necessity." *Salvatore v. State*, 366 So.2d 745, 750 (Fla.1978) (citing *State ex rel. Wilson v. Lewis*, 55 So.2d 118, 119 (Fla.1951)) . There is an inverse relationship between the standard of prejudice that the defendant must meet in order to obtain a new trial and the extent to which the conduct in court "violated fundamental notions of fairness." *Id.*

Interpretation of Florida law by Florida courts is binding on a federal court deciding a petition for writ of habeas corpus. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

(reaffirming the principle that a state court's interpretation of state law, including one announced

on direct appeal of the challenged conviction, must be followed by federal courts). If Mr.

Mendoza does not show that his appellate counsel should have raised this claim because it was a

meritorious claim under Florida law, he cannot prevail. Mr. Mendoza must show that counsel's

performance was deficient as required under the first prong of *Strickland* because his appellate

counsel cannot be deemed ineffective for failing to raise a non-meritorious claim. *See Jones v.*

*Campbell*, 436 F.3d 1285, 1304 (11th Cir. 2006) (finding it *fortiori* that appellate counsel was

not ineffective for failing to raise an issue on appeal when the trial counsel's inactions were not

deemed ineffective assistance of counsel for initially failing to object).

Here, the central issue is whether the trial judge's ruling which changed from pre-trial to

mid-trial "violated fundamental notions of fairness" and prevented the opportunity for the

defense to "receive a fair trial" such that appellate counsel should have raised this error on direct

appeal. *Salvatore*, 366 So.2d at 750. In order to properly assess the prejudicial effect that the

mid-trial ruling had on Mr. Mendoza, it is important to consider his actions in reliance on the

trial judge's pre-trial ruling.

First, the defense formulated its theory of the case around the assertion that Mr. Calderon

was a bolitero. This assertion supported the defendant's primary argument that, on the night of

the murder, Mr. Mendoza and the Cuellar brothers were not confronting Mr. Calderon for the

purposes of robbing him; rather, they were simply trying to procure a debt that Mr. Calderon

owed to one of them. This defense would be much more credible with evidence that Mr.

Calderon was involved in a bolito. The defense proceeded to advance this theory and centered

69

their opening statement around this argument at trial.  However, mid-way through the trial the

trial judge reversed course and limited the inquiry to Mr. Calderon's involvement in a bolito

solely *at the time of the murder*.

Mr. Mendoza contends that he formulated his defense theory on the knowledge that the

witnesses would testify that Mr. Calderon had previously been in engaged in bolito operations.

Mr. Mendoza asserts that the trial judge's mid-trial ruling hampered his ability to advance that

theory.   This assertion is not entirely without merit.  At trial, Mr. Mendoza was limited to asking

solely whether the wife or officers had direct, personal knowledge that Mr. Calderon was a

bolitero, *at the time of the murder*.  If the answer was no, which indeed was the case, no further

inquiry could be made.  However, for purposes of granting a mistrial, the key issue in Florida is

not whether the trial judge's conduct adversely affected Mr. Mendoza, but whether that conduct

prevented him from "receiving a fair trial." *Cole*, 701 So.2d at 853.

While the judge's ruling may have limited Mr. Mendoza, it did not deprive him of a "fair

trial."   Granting Mr. Mendoza's motion for mistrial was not warranted.  Even if the trial judge

allowed the defense a greater opportunity to prove that Mr. Calderon was a bolitero, and had the

defense succeeded in doing so, this evidence does not necessarily prove or negate any material

fact.  At trial, there was no evidence offered by the defense that Mr. Calderon owed Mr.

Mendoza or either of the Cuellar brothers a loan or debt, and no evidence was presented

demonstrating that the three men's purpose for confronting Mr. Calderon was to procure a loan

or debt.  Simply relying on the inference that since Mr. Calderon was a bolitero, the

confrontation between him and Mr. Mendoza must have regarded a loan or debt is not sound

without more supporting evidence.

Furthermore, while the trial judge's mid-trial ruling surprised Mr. Mendoza, it did not significantly alter the pre-trial ruling. *See generally Cole,* 701 So.2d at 853 (finding that mistrial was not warranted in part because the trial error was "isolated and inadvertent and was not focused upon"). Only direct, personal knowledge would be admissible to support this evidence in the first instance. Because Mr. Calderon's wife did not have personal knowledge that, *at the time of the murder,* Mr. Calderon was a bolitero, other questions regarding his past history as a bolitero would not have been pertinent. Therefore, the Court cannot determine that the Florida Supreme Court's decision was unreasonable.

As the underlying claim lacks merit, appellate counsel cannot be deficient for failing to raise it. *See Owen,* 568 F.3d at 915. Further, Mr. Mendoza has failed to establish how his appellate counsel's failure to argue this claim on direct appeal prejudiced him. This is fatal to his claim. *See Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th Cir. 2011) (citing *Black v. United States*, 373 F.3d 1140, 1142 (11th Cir. 2004); *see also Clark v. Crosby*, 335 F.3d 1303, 1312 n. 9 (11th Cir. 2003). The prejudice prong of the *Strickland* test is whether there was a reasonable probability that had appellate counsel not been deficient, the appellate court would have granted the petitioner a new trial. Given the trial record, the Florida Supreme Court's determination of this sub-claim was not unreasonable. As such, habeas relief is denied.

### iii.  *nonstatutory aggravating factors*

Mr. Mendoza's final claim for habeas relief is that his appellate counsel was ineffective for failing to argue "fundamental error due to the state's improper introduction of nonstatutory

aggravating factors." ([DE 1] at 101).  Specifically, Mr. Mendoza asserts that the prosecutor's

closing argument "effectively encouraged the jury to impose the death penalty" based on future

dangerousness. (*Id.*).  Mr. Mendoza asserts three specific objectionable comments.

> Yet, the prosecutor pointedly suggested that the jury impose the death penalty
> because Mr. Mendoza was a threat to the community and had **pending** robbery
> charges.  The prosecutor started off by telling the jury that "**certain people**. . .
> warrant the death penalty." Later the prosecutor emphasized that Mr. Mendoza's
> "actions and activities **in this community**" warrant the death penalty and that he
> committed violent crimes "against **people in this community.**"  Finally, and most
> significantly, the prosecutor improperly argued to the jury about Mr. Mendoza's
> pending robbery charges that involved using a firearm.[28]

([DE 1] at 102)(citations omitted)(emphasis in original).  Mr. Mendoza argued this claim in his

state petition for writ of habeas corpus.  The Florida Supreme Court denied the claim as follows:

> Mendoza next argues that appellate counsel should have raised the issue of the
> prosecutor's introduction of improper nonstatutory aggravating factors at the
> penalty phase closing arguments. The various comments made by the prosecutor
> that Mendoza argues introduced nonstatutory aggravators include:
>
> > The fact of the matter is the citizens in this country—and especially the
> > citizens here in the State of Florida have decided that certain people and
> > certain crimes warrant the death penalty.
> >
> > ....
> >
> > In your deliberations in the jury room the Judge tells you you are to go back
> > there and first look at whether or not there are sufficient aggravating
> > circumstances to warrant your recommending the death penalty before you
> > even get to the mitigating.

---

[28] This specific issue (Mr. Mendoza's pending robbery charges) was argued as a separate
claim for relief in Mr. Mendoza's state habeas petition. ([DE 18-5, Appx. N, Vol. 4] at 57). The
Florida Supreme Court found "this claim is procedurally barred" because this issue was raised on
direct appeal.  *Mendoza*, 964 So.2d at 134.  A review of the record shows that this claim was, in
fact, made on direct appeal.  ([DE 18-1, Appx. A, Vol.1] at 44-47).  Therefore, the Court accepts
the Florida Supreme Court's procedural bar as to this sub-issue.

> I suggest to you that there are, that this defendant's actions and activities in
> this community, from what you have heard, warrants that you recommend
> that he receive the death penalty.
>
> ....
>
> ... You heard nothing, nothing until after he had committed violent crimes
> against people in this community, that he wanted to say that he had mental
> problems and that is why or that is some excuse for what he did.
>
> Trial counsel did not object to any of these comments, and we find that Mendoza
> has failed to prove that the comments introduced nonstatutory aggravators or were
> fundamental error. Therefore, appellate counsel was not ineffective for failing to
> raise this issue.

*Mendoza*, 964 So.2d at 133-34.  The Court has reviewed the record.  During the State's penalty

phase closing argument, defense counsel did not object to any of the referenced comments made

by the prosecutor.  ([DE 18-61, Appx. W, Vol.20] at 63-81).  At the time of Mr. Mendoza's

direct appeal, Florida law required that, absent an objection from the defense, the State's

contentions made during closing  constituted "fundamental error."  *See Crump v. State*, 622

So.2d 963 (Fla. 1993).

> Fundamental error goes to the foundation of the case or the merits of the cause of
> action and can be construed on appeal without objection." *Crump v. State*, 622
> So.2d 963, 972 (Fla.1993). The court in *Silva v. Nightingale*, 619 So.2d 4 (Fla. 5th
> DCA 1993) held that "fundamental error in closing occurs when the 'prejudicial
> conduct in its import is so extensive that its influence pervades the trial, gravely
> impairing a calm and dispassionate consideration of the evidence and the merits
> by the jury.' " *Id.* at 5.

*Hampton v. State*, 680 So.2d 581, 585 (Fla. 3d DCA 1996).  In Mr. Mendoza's case, the Florida

Supreme Court expressly found that the State's comments did not "introduce nonstatutory

aggravators or were fundamental error."  *Mendoza*, 964 So.2d at 134.  If this assessment is

correct, it means that appellate counsel's performance cannot be deficient if he failed to assert a nonmeritorious claim. *See Philmore v. McNeil*, 575 F.3d 1251, 1264-65 (11th Cir. 2009).

In Florida, fundamental error is defined as "error which reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *State v. Wilson*, 686 So.2d 569, 570 (Fla. 1996). Applying the facts here to the law in Florida at the time of Mr. Mendoza's direct appeal, the Court does not conclude that the Florida Supreme Court's determination that appellate counsel was not ineffective was unreasonable. According to Florida law, once trial counsel failed to object, appellate counsel could only assert this claim if he could show fundamental error. After finding Mr. Mendoza could not, the state court concluded that appellate counsel was not ineffective for failing to raise a nonmeritorious claim. Even if the Court were to disagree with this conclusion, AEDPA demands more. In order to find the state court's determination unreasonable under § 2254(d)(1), "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Harrington v. Richter,* 131 S.Ct. 770, 786 (2011). Applying the facts of this case to the standard in *Harrington*, the Court cannot grant habeas relief. Habeas relief is, therefore, denied.

### *VII. Conclusion*

For all the reasons set forth above, it is:

**ORDERED AND ADJUDGED** that Marbel Mendoza's Petition for Writ of Habeas

Corpus [DE 1] is **DENIED**.  All pending motions are denied as moot.  A Certificate of

Appealability is **DENIED.**  The Clerk of the Court is instructed to **CLOSE** the case.

    **DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida this 25TH day of July

2013.

JAMES I. COHN
United States District Judge

Copies to:
Counsel of Record

75